14 So.2d 527

### HOUSING AUTHORITY OF BIRMINGHAM DIST. v. MORRIS.

6 Div. 77.

Supreme Court of Alabama.

June 3, 1943.

Rehearing Denied June 30, 1943.

Coleman, Spain, Stewart & Davies, of Birmingham, for appellant.

Lange, Simpson, Brantley & Robinson, of Birmingham, for appellee.

560

BROWN, Justice.

Trespass on the case by the tenant against the landlord claiming damages for personal injuries received by the plaintiff on November 12, 1941, while using the commode installed in the bathroom of the apartment leased to the plaintiff and his wife by defendant, for family use, and while in the occupancy thereof.

The complaint, as it went to the jury, consists of three counts. Count A ascribes plaintiff's injury and damage to the negligence of the agents or servants of the defendant while acting within the scope of their employment in the maintenance of the water system supplying plaintiff's apartment with water, which defendant undertook and agreed to do, which, as the count avers, "Said pipes and water system were in the custody and under the control of the defendant and were retained by defendant in its own possession, custody and control at said time for supplying of water

to plaintiff" and all other tenants of the defendant for the common benefit of said tenants in that respect, "in consequence of which plaintiff was badly scalded and burned."

Count B which adopts the inducement of Count A, with additional averments showing that there was attached to and a part of said water supply system in each of said units of said apartment house, a gas heater designed to supply hot water for family use, ascribes the plaintiff's injury to the negligence of defendant's servants in negligently maintaining said water-heaters, as a proximate consequence of which plaintiff was scalded and burned.

Count C ascribes plaintiff's injuries and damage to the negligence of the defendant's agents or servants in maintaining the hot water tank in plaintiff's apartment as a part of the water system designed by the defendant in supplying water to said apartment for family use.

After demurrer overruled to the complaint, the defendant pleaded to each of said counts, as the general issue, "The allegations of said counts are untrue." This plea seems to have been treated by the parties and the trial court as a plea of "Not guilty." See Code 1940, T. 7, § 225. The defendant pleaded specially, pleas 3, 4, 5 and 6—contributory negligence—and special plea 2 setting up an exculpating stipulation in the lease, purporting to exculpate and save the landlord from liability for damages to the person or property of the tenant, his visitors or licensees from any cause whatsoever.

Special pleas 2, 3, 4 and 6 were eliminated by demurrer, sustained, and the case went to the jury on said Counts A, B and C, the plea denying the allegations of the complaint, and plea 5, charging that plaintiff proximately contributed to his injury and damage by his own negligence, in substance, that plaintiff with knowledge that the thermostat—the safety device on the hot water tank—had been removed or blocked off by defendant, turned on the gas and "negligently allowed said heater in his apartment to burn for an unreasonable length of time and to become overheated and to generate steam and to cause said steam to back up into the commode in his apartment."

In the absence of an averment in the counts of the complaint that plaintiff received his injuries while using the com-

mode in his apartment, said counts are defective in failing to show causal connection between the defendant's negligence and plaintiff's injury. Western Railway of Alabama v. Mutch, 97 Ala. 194, 11 So. 894, 21 L.R.A. 316, 38 Am.St.Rep. 179.

■ This defect was not, however, pointed out by specific ground of the demurrer, as required by the statute, and avails the appellant nothing. Code 1940, T. 7, § 236; Deslandes v. Scales, 187 Ala. 25, 65 So. 393.

Each of said counts aver in substance and legal effect that the defendant engaged to supply plaintiff's apartment with water and retained possession and control of the water system in said apartment house to that end, and its servants, agents or employees while acting within the scope of their employment negligently caused hot-water to be propelled through the cold water pipes into the commode in plaintiff's apartment, and as a proximate consequence plaintiff received his said injuries—and was not subject to the grounds stated in the demurrer. Prudential Ins. Company of America v. Zeidler et al., 233 Ala. 328, 171 So. 634; Wardman v. Hanlon, 52 App.D.C. 14, 280 F. 988, 26 A.L.R. 1249.

■ Defendant's special pleas of contributory negligence 3, 4 and 6, impute to plaintiff the negligence of the members of his family without averring he had knowledge of their act in turning on and lighting the gas under the hotwater boiler in plaintiff's apartment, and that to allow the water in the boiler to become overheated would force it to back its way through the cold water pipes into the commode and render said commode dangerous for the uses it was designed to serve.

The demurrer to these pleas pointed out those defects and was properly sustained.

The defendant's plea 2 is in the following language: "2. Defendant avers that plaintiff was occupying said apartment under a written lease. Defendant further avers that in said lease it was expressly provided as follows: 'Neither the landlord nor any of its representatives or employes shall be liable for any damage to person or property of the tenant, or any member of tenant's family, or any of the tenant's visitors or licensees for loss from theft, or from any cause whatsoever." The averments of the plea do not disclose the background of the clause, except as it may be gathered from the averments of the complaint, showing a continuing active duty on the defendant to maintain and keep in repair the elements constituting the water system in said apartment.

The demurrer challenges the sufficiency of the plea on the ground that the defendant cannot exculpate itself from liability for its own negligence by stipulation in the lease, and this is appellee's contention.

The appellant, on the other hand, contends that such stipulation is valid and within the contracting powers of the defendant.

These contentions present the controlling questions in this case, which are not without difficulty, and bring forward the nature, purpose, powers and authorities of the defendant corporation, and the legislation, which brought it into being.

The defendant was incorporated, as its name and activities clearly indicate, under the "Housing Authority Law" approved February 8, 1935, Acts 1935, pp. 126, 143, carried forward in the Code of 1940, with amendments, as Tit. 25, Chapter 2, §§ 5 to 30, inclusive.

The background for the enactment of the law is stated in Chapter 2 of the Act of 1935, p. 126, Code 1940, T. 25, § 5, towit: "Finding and declaration of necessity.—It is hereby declared that unsanitary or unsafe dwelling and public school accommodations exist in various cities of the state and that such unsafe or unsanitary conditions arise from overcrowding and concentration of population, the obsolete and poor condition of the buildings, improper planning, excessive land coverage, lack of proper light, air and space, unsanitary design and arrangement, lack of proper facilities, and the existence of conditions which endanger life or property by fire and other causes; that in all such cities persons of low income are forced to reside in unsanitary or unsafe dwelling accommodations; that in various cities of the state there is a lack of safe or sanitary dwelling and public school accommodations available to all the inhabitants thereof and that consequently persons of low income are forced to occupy overcrowded and congested dwelling accommodations; that these conditions cause an increase in and spread of disease and crime and constitute a menace to the health, safety, morals and welfare of the citizens of the state and impair economic values; that the aforesaid conditions also exist in certain areas surrounding such cities; that these conditions cannot be remedied by

the ordinary operations or *private enterprises;* that the clearance, replanning and reconstruction of the areas in which unsanitary or unsafe housing conditions exist and the providing of safe, sanitary and uncongested dwelling accommodations at such rentals that persons who now live in unsafe or unsanitary or congested dwelling accommodations can afford to live in safe, sanitary and uncongested dwelling accommodations, *are public uses and purposes for which public money may be spent and private property acquired;* that it is in the public interest that work on such projects be instituted as soon as possible in order to relieve unemployment which now constitutes an emergency; and the necessity in the public interest for the provision hereinafter enacted, is hereby declared as a matter of legislative determination." (Italics supplied.)

In the definition of terms is the following: "Section 3. * * * (1) 'Authority' or 'housing authority' shall mean a public body organized as a body corporate and politic in accordance with the provisions of this Act for the purposes, with the powers and subject to the restrictions hereinafter set forth. * * *

'Housing Project' shall include all real and personal property, buildings and improvements, stores, offices, public school buildings, lands for farming and gardening, and community facilities acquired or constructed or to be acquired or constructed pursuant to a single plan of undertaking (a) to demolish, clear, remove, alter or repair unsanitary or unsafe housing and/or (b) to provide dwelling accomodations [accommodations] at rentals within the means of persons of low income. The term 'housing projects' may also be applied to the planning of the buildings and improvements, the acquisition of property, the demolition of existing structures, the construction, reconstruction, alteration and repair of the improvements and all other work in connection therewith." Acts 1935, p. 127, Code 1940, Tit. 25, § 6.

Section 6 of the act provides: "Duty of the authority and commissioners of the authority. The authority and its commissioners shall be under a statutory duty to comply or to cause compliance strictly with all provisions of this Act and the laws of the State of Alabama and in addition thereto, with each and every term, provision and covenant in any contract of the authority on its part to be kept or performed." Acts 1935, p. 131, § 6, Code 1940, Tit. 25, § 9.

The commissioners constituting the governing board are subject to removal by the mayor of the city or town. Acts 1935, p. 131, § 8, Code 1940, Tit. 25, § 11.

The act grants to the "Authority" broad powers, among which are: "Section 9. Powers of authority. *An authority shall constitute a public body and a body corporate and politic exercising public powers,* and having all the powers necessary or convenient to carry out and effectuate the purposes and provisions of this Act, including the following powers in addition to others herein granted; To investigate into living, dwelling and housing conditions and into the means and methods of improving such conditions; to determine where unsafe, or unsanitary dwelling, public school or housing conditions exist; to study and make recommendations concerning the plan of any city located within its boundaries in relation to the problem of clearing, replanning and reconstruction of areas in which unsafe, or unsanitary dwelling, public school, or housing conditions exist, and the providing of dwelling accomodation [accommodations] for persons of low income, and to cooperate with any city or regional planning agency; to prepare, carry out and operate housing projects; *to provide for the construction, reconstruction, improvement, alteration or repair of any housing project or any part thereof;* * * * to sue and be sued; to have a seal and to alter the same at pleasure; *to have perpetual succession."* Acts 1935, p. 132, § 9, Code 1940, Tit. 25, § 12. (Italics supplied.)

The authority is by §§ 12 and 13 endowed with the element of sovereignty, the power of Eminent Domain, to take private or government property for its uses and purposes. Acts 1935, p. 135, §§ 12 and 13, Code 1940, Tit. 25, §§ 15, 16.

■ There is nothing in the act that expressly exempts the "authority" from liability proximately resulting from its negligence or the negligence of its agents or servants, in conducting the business for which it was given life, or that authorizes it to provide by contract for such immunity. The express authority in the act of its creation subjecting it to be sued generally indicates a legislative intent to the contrary.

Corporations created for public purpose must of necessity function through human agency, and it is a well recognized general principle, founded on human experience, that "Agreements exempting persons from liability for negligence induces a want of care, for the highest incentives to the exercise of due care rest in consciousness that a failure in this respect will fix liability to make full compensation for any injury resulting from the cause. It has therefore been declared to be a good doctrine that no person may contract against his own negligence. * * *." 12 Am.Juris. p. 683, § 183; Southern Express Co. v. Owens, 146 Ala. 412, 41 So. 752, 8 L.R.A.,N.S., 369, 119 Am.St.Rep. 41, 9 Ann.Cas. 1143.

This general principle is expressly applicable to persons and corporations engaged in public service in respect to the public service for which they are created, or for which they have been granted the element of sovereignty—the power of eminent domain. In respect to such matters public policy forbids that they contract for immunity for their negligence or the negligence of their servants or agents committed in the prosecution of their major business. Southern Express Co. v. Owens, 146 Ala. 412, 41 So. 752, 8 L.R.A.,N.S., 369, 119 Am. St.Rep. 41, 9 Ann.Cas. 1142; Southern Railway Company v. Jones, 132 Ala. 437, 31 So. 501; American District Tel. Co. of Alabama v. Roberts & Son, Inc., 219 Ala. 595, 122 So. 837.

The statute under which the "Housing Authority" was created and has perpetual existence imposes on said authority a duty to provide "dwelling accomodations [accommodations] for persons of low income, and to cooperate with any city or regional planning agency; to prepare, carry out and operate housing projects; to provide for the construction, reconstruction, improvement, alteration or *repair of any housing project and part thereof*." (Italics supplied.)

And as stated in the text of American Jurisprudence, supra: "There is not doubt that the rule which forbids a person to protect himself by an agreement against damages resulting from his own negligence applies when the agreement protects him against some duty imposed by law." 12 Am. Juris. § 183, p. 684; Griswold v. Illinois C. R. Co., 90 Iowa 265, 57 N.W. 843, 24 L.R.A. 647; James Quirk Mill. Co., v. Minneapolis & St. Louis R. Co., 98 Minn. 22, 107 N.W. 742, 116 Am.St.Rep. 336.

The authority cited and relied on by appellant to sustain the exculpatory stipulation in the lease Life & Casualty Ins. Co. of Tennessee v. Porterfield, 239 Ala. 148, 194 So. 173, differentiates itself by the statement in the opinion (239 Ala. 150, 194 So. 175): "This defendant was not such a public service utility or [nor] did the service involved render the exemption or limitations set out in the above quoted provisions contrary to public policy."

Another well recognized exception to the general rule is when the contract is a mere incident to ownership of lands, such as a lease by a railroad company of a part of its right-of-way for the erection of a warehouse—public interest not being affected—such stipulation is valid, "as the company is under no obligation to permit the lessee to erect a structure for his own convenience, it may do so on condition that he shall assume the risk." 12 Am.Juris., p. 684, § 183; Hartford F. Ins. Co., v. Chicago, M. & St. P. R. Co., 8 Cir., 70 F. 201, 30 L. R.A. 193; Id., 175 U.S. 91, 20 S.Ct. 33, 44 L. Ed. 84.

McKinney v. Mobile & Ohio R. Co., 215 Ala. 101, 109 So. 752, 48 A.L.R. 998, is within this exception. In that case it was observed: "In upholding the validity of such contracts, the courts point out that in making such a lease the railroad is not in the exercise of duties as a common carrier, but only in its private capacity."

The defendant in the instant case in entering into the lease with plaintiff was functioning in the major field of its activity as contemplated by the Housing Authorities Law, and carrying into execution the public policy evinced thereby.

On a different principle but with like effect, "It is a well-known and just rule that where parties by contract enter into a relation carrying a legal duty, while one may limit the scope of his duties [not imposed by positive law], he cannot stipulate for protection against negligence in the performance of the duties he does assume." Ex parte Mobile Light & R. Co., (Thompson v. Mobile Light & R. Co.), 211 Ala. 525, 527, 101 So. 177, 179, 34 A.L.R. 921 (Brackets supplied); Moore v. City of Mobile, 1 Stew. 284; anno. 84 A.L.R. 659.

564

The plaintiff's demurrer to the defendant's plea 2 was, therefore, sustained without error.

The evidence is without dispute that during the years 1940–1941, the defendant owned and operated a "project" under the "housing Authorities Law" known as "Elyton Village" located in the City of Birmingham. Said project was an apartment building consisting of ten units designed and equipped for family use. Each unit was provided with bathroom, equipped with bath tub, lavatory and commode. Each of said units were equipped with a gas hot water tank designed for supplying hot water for family use, and as designed and originally installed, each tank was equipped with a thermostat, placed on the tank by the manufacturer as a safety device to prevent the water from overheating. The gas, as the evidence shows was turned on by hand but when the hot water reached "the danger point" 212° Fahrenheit, the thermostat automatically cut off the gas and the gas jet under the tank could not be relighted until the tank cooled.

Electric lights, gas and water were furnished each of the units by the defendant with certain limitation, not pertinent here. The water was supplied by a common main —two inch pipe—leading into the project, and leads of 3/4 inch pipes were taken from this main to the several units to service the hot and cold water equipment, installed in said units for the use of the tenants.

The evidence is also without dispute that defendant acting through its superintendent in charge of said Elyton Village Project, on complaint of some of the tenants that they were not obtaining sufficient gas for hot water, blocked off the thermostats—the safety devices—on said hot water tanks and required and instructed some of the tenants that when they had sufficient hot water for their needs that they would have to shut off the gas by hand.

There is evidence going to show that when the hot water tank in one unit was allowed to overheat to the point where the pressure from steam and hot water was greater than the pressure on cold water from the main, that the pressure of the steam and hot water would back out the cold water in the cold water pipes, and pass through the main into the cold water pipes leading to the commode in an adjoining apartment, and also into the commode in the same unit. On some occasions, as the evidence shows, the gas on some water tanks was allowed to burn all night.

There is also evidence going to show that the defendant through its managing superintendent had knowledge of this condition and did nothing to remedy the same.

The plaintiff whose occupation was that of a Greyhound bus driver came home from his last trip late on the evening before his injury, slept late, until about 9 or 10 o'clock, got up, went to the bath room in the apartment, and while using the commode in said apartment received, first, second and third degree burns on the posterior of his person, from which, as the evidence shows, he suffered and still suffers.

The plaintiff became a tenant of "Unit No. 269, on 131 Village Court Elyton Village" in 1940, and renewed his lease, for a term "beginning at noon Sept. 1st, 1941, and terminating at noon September 16th, 1941, at a rental of $9.685, payable in advance on the first day of each semi-monthly term." The lease provided that it "shall be automatically renewed for a succeeding term of one-half month at the same rental payable in advance, with the right of each of the parties to terminate the lease on ten days written notice given during the term."

The lease is very restrictive of the tenant's rights; among other restrictions are:

"Not to assign the lease; nor to sublet or transfer possession of the premises; not to give accommodation to boarders or lodgers; nor to use or permit the use of the dwelling for any other purpose than a private dwelling solely for the Tenant and his family consisting of Julian, Ruth and Judith Morris. * * * (e) * * * not to make any repairs or alterations without the written consent of the Landlord; not to display any signs whatsoever; not to use tacks, nails or screws or other fasteners in any part of the premises except in a manner prescribed by the Landlord; and to notify the Landlord promptly of the need of any repairs to the premises.

"(f) To follow all rules or regulations prescribed by the Landlord concerning the use and care of the premises and of any common or community space in the Project, including stair halls, walks, drives, playgrounds, laundries, community rooms, .etc.

"(g) To permit the Landlord or its representatives to enter the premises during all reasonable hours to examine the same or to make such repairs, additions

or alterations as may be deemed necessary and to show the premises for releasing.

"(h) To submit to the Landlord annually a signed statement, at such time and in such form as he may request, setting forth the facts as to the annual income of himself and his family, and as to the number and ages of the members of his family. * * *

"(3) If the Landlord determines, after submission by the tenant of any of the statements referred to in Section 1(h) above, that the annual net income of the tenant and his family exceeds the income limit for the rental which he is paying, then the Landlord may require that the tenant move into a unit of an appropriate higher grade and/or pay the rental established for such grade, provided that in any event if it is determined by the Landlord that the annual net income exceeds the income limit for the highest grade, the Landlord may terminate this lease at the end of any calendar month by giving the tenant not less than 30 days' prior notice in writing. At the expiration of the time stated in said notice, the Landlord's representative shall have the right immediately to reenter the premises and remove all persons and property therefrom, and the tenant hereby expressly waives all notices required by law to terminate his tenancy and waives any and all legal proceedings to recover possession of said premises, and agrees that upon any such termination the representatives of the Landlord may immediately reenter said premises and dispossess the tenant without legal notice or the institution of any legal proceedings whatsoever.

"(4) In the event of misrepresentation of any material fact in the application of the tenant or in any statement submitted to the Landlord by the Tenant pursuant to covenant 1(h) above, or upon any breach of the covenants or conditions of this lease or of the rules and regulations, this lease shall be automatically terminated and the Landlord's representatives shall have the right immediately to reenter the premises and remove all persons therefrom, and the Tenant hereby expressly waives all notice required by law to terminate his tenancy and waives any and all legal proceedings to recover possession of said premises, and agrees that upon any such breach the representatives of the Landlord may immediately reenter said premises and dispossess the Tenant without legal notice or the in-stitution of any legal proceedings whatsoever. * * *

"(1) The Tenant and members of his household, guests, and employees shall comply with all laws and city ordinances affecting the use or occupation of the premises and with all reasonable rules or regulations now or here adopted by the Landlord for the safety, comfort, and welfare of the occupants of the Project.

"(2) The Tenant shall not carry on any business whatsoever nor display signs of any type in or about the premises.

"(3) The Tenant shall not waste nor unreasonably use water, electricity or gas.

"(4) The Tenant shall at all times keep the dwelling and fixtures therein in a clean and sanitary condition.

"(5) The Tenant shall not sell or give accommodations in the premises to any boarders, lodgers, or roomers. * * *

"(7) The tenant shall not make any alterations or repairs to the premises or the equipment therein and shall not install any additional locks or fixtures. * * *

"(9) The Tenant must report to the Management Office at once any accident or injury to water pipes, toilets, drains, or fixtures, electric wires or fixtures, or other property of the Landlord, and all breakage, damage, or loss of any kind. * * *

"(12) The Tenant's lease does not include the right to use the interior community facilities in the project, but the Landlord may, in his discretion, extend the privilege to use such facilities to the Tenant. The Tenant must make application for written permission to use such facilities. * * *

"(15) Sidewalks, passages, public halls, stairways, fire escapes, and vestibules shall not be obstructed, nor be used for any purpose other than ingress to or egress from dwellings.

"(16) No tacks, nails, or other fasteners or cement shall be used in laying carpets, rugs, or linoleum on the floors of the Tenant's dwelling. * * *

"(18) No shades, awnings, or window guards shall be used except as shall be put up or approved by the Landlord.

"(19) No articles of any description shall be hung from the windows or doors or placed on the window sills. Nothing whatsoever shall be thrown from the win-

dows or swept or thrown out of the doors of any dwelling. * * *

"(22) The Landlord or his representatives shall have the right to enter the Tenant's premises during all reasonable hours to examine the same or to make such repairs, additions, or alterations as may be deemed necessary for the preservation thereof or of the building; or to exhibit the said premises; or for the purpose of removing placards, signs, fixtures, alterations, or additions on the premises which are in violation of the Tenant's lease and of these conditions of occupancy.

"(23) The Landlord in all cases shall retain the right to control and prevent access into the buildings and grounds of all persons whom he considers undesirable. * * *

"(27) No animals or birds shall be taken into or kept in or about the buildings, save with the written consent of the Landlord.

"(28) Amendments hereto and special rules and regulations for the use of social and recreational spaces may be made from time to time and posted on the bulletin board. The Tenant agrees to comply therewith.

"(29) The tenant hereby authorizes the Landlord to stop furnishing. electrical energy and gas when payment of current rent is five or more days in arrears. * * *."

This is not the ordinary lease where the tenant takes the property as he finds it, with the right to use it as he pleases and to make repairs thereon for his own comfort and convenience. The tenant's rights here are under strict supervision of the Housing Authority's management, with the reserved right to make all alterations and repairs, with the right to enter the tenant's apartment at all reasonable hours.

There is no evidence that the plaintiff was instructed how to avoid overheating or warned of the danger incident thereto, or that he had any knowledge of previous overflows of steam and hot water through the cold water leads of the system into the commode or cold water faucets.

The duty resting on the landlord under the relation of the parties created by the law under which defendant came into being and still exists, and the terms of the lease, was continuing and active, and many of the principles stated in brief of appellant are not here applicable.

The evidence shows that the Housing Authority adopted and pursued a course of dealing in the selection and retention of its tenants, requiring written applications with full information as to the reliability and respectability of such applicants before accepting the applicant as a tenant, and reserved and exercised a large discretion in respect to the management and control of said project, and in the exercise of its powers, through its authorized agent, blocked off and destroyed the efficacy of the thermostat, and as the evidence further goes to show, rendering the hot water tank, a part of the water system, defective and dangerous.

If a reasonably prudent man, so circumstanced, would have anticipated that the tenants or any of them would turn on the gas provided for heating the water and allow it to remain on and overheat said tank or tanks beyond the danger point and create such pressure as to force steam and hot water through the coldwater pipes, the jury, under the facts in this case, were warranted in finding the defendant guilty of negligence, holding it liable for said injury and damages, in the absence of negligence on the part of plaintiff contributing to his hurt. 20 R.C.L. p. 34, § 28, IB p. 83, § 73; 38 Am.Juris. 667, § 24.

It is stated in 20 R.C.L. p. 34, § 28, supra: "It is a corollary of the maxim 'Sic utere tuo ut alienum non laedas' that everyone shall investigate, inspect, and test the instrumentalities maintained by him, guided in so doing by the knowledge that common experience offers with respect to the possibility of peril. Every peril, it is safe to say—including such as are termed latent or hidden—need not be discovered; for no man is an insurer of the safety of others. But if common experience has demonstrated that dangers lurk in the method adopted or in the instrumentality maintained by a person he rests under the obligation of ascertaining the peril and taking precautions to avoid injury therefrom. * * *"

This principle is peculiarly applicable under the evidence in the instant case. It shows that a thermostat was installed on all the gas hot water tanks by the manufacturer, accompanied with a warning attached to it that it was a safety device, and that to heat water beyond 212° Fahrenheit in such tank was dangerous. The witness Whildin, the architect who designed and constructed the building, stated, among

other things: "This was conceived for thermostatic control. I don't think it had a popoff on it anywhere. Some installations that do not have thermostats do have popoffs. I have put them both ways. They sometimes have popoffs and sometimes they don't. It depends entirely on the operation that is intended. I don't believe I would build a building like this without one or the other, a popoff or a thermostat. * * * "The purpose of the thermostat on these particular heaters was to get a tank of hot water and the thing automatically cut off to save gas. I do not recall whether to start with these heaters had manual controls on them, that is, to cut on and off manually. Assuming that they did have manual controls the purpose of the thermostat would be to furnish an added means of safety or added safety factor; it would add an extra degree of safety to it. I have looked at one of these heaters. I can't say whether or not they could be manually operated in spite of the thermostat; * * *"

█ As we have stated before, there was no evidence showing that plaintiff had notice or knowledge that it was dangerous to use the hot water tank without the thermostat. In fact he had a right to rely on the defendant to furnish reasonably safe appliances. At best, from appellant's point of view, the question of contributory negligence was for the jury. Going v. Alabama Steel & Wire Co., 141 Ala. 537, 549, 37 So. 784.

There is no question here or in the trial court that the damages awarded were excessive. Hence rulings on evidence touching the element of damages if error were without injury.

We have carefully examined the argument, the points made, and the authorities cited. The principles stated, we believe, answer all of them.

Affirmed.

All the Justices concur.

## On Rehearing.

BROWN, Justice.

█ There is nothing in Opinions of the Justices, 235 Ala. 485, 179 So. 535, or the opinion of the Court in Brammer v. Housing Authority of Birmingham District, 239 Ala. 280, 195 So. 256, that militates against the holding in the foregoing opinion that the housing authority is a corporate entity, created for purposes, among others, of providing safe dwelling quarters for persons of low income, and that it cannot contract against its liability for negligence. There is certainly nothing in those opinions or in the opinions of courts of other states, cited in the application for rehearing, that would justify a holding that said housing authority may create and maintain a trap to inflict personal injury upon its tenants. The suggestion that said corporation is a governmental agency is no answer to its liability. The books are full of decisions holding that such governmental agencies may be sued where the statutes under which they exist so authorize. An apt illustration is the Director General of Railroads created and existing during World War I. The sheriff is an officer of the state, created and existing under its police power. Nevertheless the sheriff can be sued for his torts because the statutes so authorize suits against him. Even a policeman may be sued for his torts and the mere fact that he is a police officer is not an answer to his liability.

█ Nor is there anything in Moore v. Walker County, 236 Ala. 688, 185 So. 175, that militates against the holding of the opinion. That was an action under the homicide act authorizing the recovery of damages against persons causing wrongful death as a punishment for such wrongful death, and the courts uniformly hold that the government and its agencies may not be penalized although they may be required to pay compensatory damages. Moreover, a county is not a corporation and has no corporate entity. "It has corporate characteristics, but it is not a municipal corporation, though often so termed. It is an involuntary political or civil division of the State, created by statute to aid in the administration of government." Askew v. Hale County, 54 Ala. 639, 641, 25 Am.Rep. 730.

It was on these principles that the County of Walker was held not liable in Moore's case, supra.

The application for rehearing is without merit and is due to be overruled. It is so ordered by the Court.

All the Justices concur.