Tom C. Hutchinson, as administrator of estate of Margaret Anne Hutchinson, deceased, appellant, v. Des Moines Housing Corporation et al., appellees.

No. 49765.

(Reported in 99 N.W.2d 81)

October 20, 1959.

Jones, Rockwell & Oliver, of Des Moines, for appellant.

Bannister, Carpenter, Ahlers & Cooney, of Des Moines, for appellee Des Moines Housing Corporation.

Bradshaw, Fowler, Proctor & Fairgrave, of Des Moines, for appellee Fort Des Moines Community Services, Incorporated.

Hallagan, Irish & Burt, of Des Moines, for appellee Bruno Ceretti.

PETERSON, J.—This case was previously before this court on an appeal as to interlocutory order in Hutchinson v. Des Moines Housing Corp., 248 Iowa 1121, 84 N.W.2d 10. The appeal pertained to pleadings. A similar case was before this court in Tedrow v. Des Moines Housing Corp., 249 Iowa 766, 87 N.W.2d 463. In this case the trial court directed a verdict in favor of all defendants, which the majority of this court affirmed.

The facts were shown in detail in the two previous cases. We will not repeat them at any length. We will sketch a few basic facts as an introduction to this case, and such additional facts as were offered in evidence, and which do not appear in the record in the Tedrow case.

Des Moines Housing Corporation secured from the General Services Authority of the United States Government, in about 1946, the possession and use of about 900 houses, and 65 stores including a recreation center. These improvements were erected at Fort Des Moines for training purposes during World War II. The only property involved in this action was the recreation center known as Building 318.

Des Moines Housing Corporation turned over to, or it might be called leased to, Fort Des Moines Community Services, Incor-

porated, Building 318, under oral lease, and without rental. Community Services, Inc., had complete possession and control of the building and all facilities. Up until February 20, 1956, Des Moines Housing Corporation paid all electric bills. It assumed no responsibility for the building except major repairs.

Community Services, Inc., rented the tavern to defendant Bruno Ceretti under written lease for $250 per month. Mr. Lockhart, the mayor, testified: "Mr. Ceretti was leasing the tavern portion of the building under an agreement marked Exhibit 12. * * * all of the revenue from Building 318 went to Community Services. Community Services *was the landlord.*" (Emphasis ours.) The lease provided: "All other public utilities (except telephone) are to be furnished for the use and benefit of lessee by lessor without expense to lessee." It also provided: "All repairs to public utilities furnished by lessor shall be made at the expense of the lessor, who shall keep and maintain said utilities, except the telephone, *in good operating condition.*" (Emphasis ours.)

On February 16, 1956, Building 318 was completely destroyed by fire. Mrs. Tedrow, three of her four children, and Margaret Anne Hutchinson, a guest, eleven years old, plaintiff's intestate, lost their lives in the fire. Mr. Tedrow was custodian of the building, and lived in an apartment on the second floor, furnished to him as a part of his compensation. This is an action for damages for loss of the life of Margaret Anne. The trial court sustained motions to direct verdict for all three defendants. Plaintiff appeals.

A rough sketch of Building 318 will be of assistance in analyzing the facts:

Appellant assigns in substance three errors relied on for reversal:

1. The court erred in failing to submit the case to the jury under the doctrine of res ipsa loquitur.

2. The court erred in not submitting the case to the jury under the doctrine of specific negligence.

3. The court erred in directing a verdict for defendants, and holding that the gaps in evidence pointed out in the Tedrow case had not been filled in.

The last two assignments of error will be considered together.

Des Moines Housing Corporation had no possession or control of the building or of any utilities. It did have an obligation as to major improvements. Inspecting, servicing and repairing of the electrical equipment would not be considered a major improvement.

Merle Epps, electrician for Des Moines Housing Corporation, testified: "I was employed by the Des Moines Housing Corporation for about 10 years. We were not supposed to do any work in the commercial buildings * * *."

Since we are going to hold the failure of Fort Des Moines Community Services, Inc., to properly inspect and maintain the electrical wiring system in good operating condition, as the basis for submission to the jury, motion to direct verdict in favor of Des Moines Housing Corporation was properly sustained. The Housing Corporation had nothing to do with maintenance of the electrical wiring.

As between Fort Des Moines Community Services, Inc., and Bruno Ceretti it clearly appears he had a written provision in his lease, previously quoted, that lessor would keep and maintain the utilities in *good operating condition*. This was part of the consideration for which he paid $250 per month. It is true the evidence shows he added several electrical appliances in his tavern. Defendant Community Services, Inc., rented the rooms to Ceretti for tavern purposes, and knew or should have known of such a probability in these modern times. The failure of Fort Des Moines Community Services, Inc., to comply with its agreement, if the jury so finds, cannot therefore be charged to Ceretti. The exception would be if defendants produced evidence that

Ceretti or his employees had placed the pennies in the fuse wells. The record fails to disclose any such evidence. The motion sustaining directed verdict in his favor was properly sustained.

We will not present the question again as to alleged error by failing to submit the case to the jury under the doctrine of res ipsa loquitur. It was fully presented in Tedrow v. Des Moines Housing Corporation, supra, and we approve and concur in that presentation and conclusion.

The remaining question is, what evidence was offered in this case, not offered in the Tedrow case, which requires submission of this case to the jury as to Fort Des Moines Community Services, Inc.?

In the Tedrow case Mr. Stebbins, an assistant in the State Fire Marshal's office, testified, but he would go no further in his testimony than to say "placing pennies behind the fuses * * * does create a fire hazard." Mr Cook, another assistant, testified: "based upon my years of experience and fire investigation, the condition that we found in Exhibit 27 [the fuse box with the pennies] could create a fire hazard, and would create a dangerous condition." Mr. Stith, City Electric Inspector of Des Moines, offered somewhat similar testimony, as to hazards of pennies in fuse wells. The testimony of these three witnesses was inconclusive, without other facts, and constituted no basis for submission to the jury, as the majority decided.

In the case at bar we find a completely different situation. The testimony is more detailed and conclusive. Three competent and qualified experts testified, and the evidence offered is sufficient to require submission to the jury as to Community Services, Inc. The additional evidence is the explanation by electrical experts as to conditions found in the fuse box, and their implications. One expert answered a comprehensive hypothetical question, which was worthy of jury consideration.

Mr. Epps, electrician, testified: "After the fire, I had an occasion to make a search of the ruins in order to find a fuse box. * * * I found a fuse box practically in the position it was in the building, except it was on the floor covered up with tile. This fuse box that I found was the one that originally was behind the bar in Bruno's Tavern. This Exhibit 3 is the fuse panel that used to be located in Building 318 behind the bar

at the tavern. * * * At the time I found Exhibit 3 I made an examination of it by unscrewing some of the fuses in the wells and I found two or three of them had pennies behind them."

Mr. Lee Bills, who worked for Ceretti from 4:30 p.m. until about 1:15 a.m., testified: "I was working in Bruno's Tavern the night of the fire. The last night that I left Bruno's Tavern before the fire I made my general inspection and looked around the tavern a half hour before I left. As far as I know, there were no lighted cigarettes. There weren't any waste paper baskets out in the tavern portion where the customers were seated that you could throw lighted cigarettes in. * * * On the night before the fire, when I closed Bruno's Tavern, there were not any greasy rags in the tavern. * * * there was never any kerosene or gasoline kept in there."

Mr. Bills testified about the extra appliances on the electric circuit in the tavern. "There were two coolers where we kept our bottled beer. * * * These coolers were cooled by motors run by electricity. These coolers were left running all night so that the next day we would have cold beer to serve. * * * On this particular night the two coolers were practically full of beer. * * * The icebox at each end of the bar was used for 6-paks. * * * That night just before the fire, the walk-in cooler was in use. * * * That is where we kept the keg beer and the quarts. The walk-in icebox was cooled by electricity."

Bruno Ceretti testified as to additional electrical appliances he had installed: "I put in two reach-in coolers, bottle coolers, and I had two small fans * * *. Other electrical equipment included my cash register, two electric clocks and the tap box. The tap box has facilities for cooling draft beer. * * * The icebox was plugged in a wall socket."

Mr. John Lagerstrom was called as an expert witness for plaintiff. He is an electrical engineer with a Bachelor and a Master's Degree in electrical engineering. He is employed at Iowa State College as Assistant to the Dean of Engineering. One fourth of his time is spent in teaching electrical subjects in the electrical engineering department, where he has been teaching for twelve years. He is a member of the American Institute of Electrical Engineering and a member of the National Committee on transmission and distribution. He has

nearly completed his study for a Doctor's Degree in electrical engineering. Mr. Lagerstrom testified:

"Q. * * * as you now look at it, tell us whether or not there are any unusual features appearing in Exhibit 3? A. There are several things. Firstly, there are several, not one, but several of the fuse holders which show evidence of having had electrical damage; and this damage in particular amounts to the fact that the brass shell which formerly was employed to screw the fuses into the socket, show evidence of having been melted down. I repeat, there are not only one, but several of these fuse holders which contain these melted down remains of fuse cartridges, fuse plugs. * * *

"Q. Now, have you had occasion to observe the wires that are now in Exhibit 3? A. Yes. These wires were at one time those circuits which led away from the box to the appliances and lighting around the room.

"Q. And is there anything unusual about the wiring leading from the bottom of the fuse panel? A. Well, an examination of the ends of these wires indicates that they were not broken but burned away.

"Q. Mr. Lagerstrom, you stated that they were burned away; does that have any particular significance to you as an engineer? A. That, together with the fact that one of these inside the box would lead me to a certain conclusion.

"Q. And what are those conclusions? A. My conclusions are these. The fact that the wires are burned off indicates that they were broken by heat and not by a mechanical force of the box falling from the wall or anything such as that; that, together with the fact that these molten brass parts show in more than one of the fuse holders, suggests that the damage in the box was caused by electrical means; and furthermore, that it must have occurred close to this box, for if it had not then only one of the fuses in the fuse holders would show any evidence of damage. My conclusion is that something happened close to this box and I would be willing to conclude that it might have happened on such a pair as this. * * *

"Q. Now, Mr. Lagerstrom, have you observed in your examination of Exhibit 3 pennies in the fuse wells? A. Yes, at the first moment I examined it we found two pennies in the fuse

holders which show evidence of having been present when an arcing disturbance took place. One of these present is in a fuse holder which has a glob of molten brass which I referred to before. * * *

"Q. And what did that indicate to you, Mr. Lagerstrom? A. That at least, this fuse holder has been involved with an overload and over temperature.

"Q. Now, the conditions that you referred to about the shorting of the two wires coming out of the second holder in the bottom row of the fuse box, Exhibit 3, could that have happened if the pennies had not been in the fuse well? A. It is my opinion that if that circuit had been properly fused it would not have burned away, because this fuse was between the source of power and the place in which we find these damaged wires. * * *

"Q. Assuming, Mr. Lagerstrom, that Exhibit 3, which has been identified as a fuse panel, as it now appears, has gone through a fire, in which the entire building where this fuse box was formerly located, was consumed by fire; now, with that assumption do you have an opinion as to whether or not the condition that you have referred to about the fusing of the metal and burning of the wires happened before the fire that consumed the building in which the fuse box was located? A. The appearance of the brass parts leads me to believe that it was melted down, electrically, because there is evidence of sputtering, which is a term indicating peculiar nature of arc and heat damage by electricity. These aren't simple molten blobs, if I may use that term to distinguish between damage caused by electricity or by heat from another source. * * *

"Q. * * * you have examined these fuse wells; and the wires that are leading out that you testified were burned off, were those wires in operation at the time that that condition happened, meaning the burning off, the fusing? What I am trying to get to, was electricity passing through them? A. Oh, now, I am trying to distinguish in my mind whether you are talking about fault conditions or whether or not these wires were originally carrying the load. I have no way of forming an opinion whether or not they were carrying a load, but I can

conclude from the appearance of the wires in the box that electricity caused damage to the box. * * *

"Q. * * * And when these wires in the course of the fire itself may have been exposed, through shorts, caused by the fire, to greatly intensified flow of electricity, anything can happen and you can have most any conceivable results, can't you? A. Now you are coming close to my mind of logic, which is to say that the first instance caused the fire, which was not prevented by the opening of the proper fuses; this in turn caused damage to the other wires, which was not properly fused as evidenced by the burning in four of these sockets."

Mr. Floyd Nelson was called as an expert witness for plaintiff. He lives at Ames, Iowa. He is supervisor of part-time instructors in fire department procedures and operations over the State. He has been employed in that work for seven years. Prior to that time he was a member and assistant Chief of the Fire Department of Atlantic for eight years. He has had special training in fire prevention work and the causes of fire. He testified:

"Q. Mr. Nelson, directing your attention to Exhibit 3, have you had occasion to examine that? A. Yes, I have. * * *

"Q. Mr. Nelson, did you notice any fusing of the material as you examined it then, as you now see it? A. Yes.

"Q. Do you have any opinion as to whether that fusing could have occurred if the sockets had been properly fused? A. Yes.

"Q. What is that opinion? A. The arcing, the damage, fusing of the metal there was caused by electrical arcing. * * * Arcing can only be caused by electricity; if you are referring to melting, it is another question.

"Q. And the arcing that you say was electrical arcing, could that have been caused by the fire that consumed the building, to melt that metal? A. Could the fire have done that melting?

"Q. Yes? A. No. * * *

"Q. Could the very fact that the penny was there prevent arcing? A. Yes."

Under cross-examination Mr. Nelson testified:

"Q. I have one more question. Would you explain your answer that the presence of pennies in the fuse wells would prevent the fusing of the metal? A. It would prevent the arcing at that point and cause arcing at points further on in the circuit. * * *

"Q. What I am trying to get at here, as far as any fusing of metal, arcing, is concerned, the presence of the pennies would prevent that in the socket? Would you explain that, why is it the presence of the penny would prevent arcing? A. Because at that point the penny carries the current.

"Q. And you have the complete circuit? A. Yes. The penny maintains the circuit which was what it was put in there for.

"Q. The fusing of the metal, would that be from arcing? A. Of which metal?

"Q. Any metal. Would the arc—would an arcing fuse copper? A. When we talk of fusing, we are talking of molten metals that were throwed from an arc and fused in places where they lit, in some instances. * * *

"Q. Now, from having examined Exhibit 3, and having noticed what you have testified to, by the fusing of the metals inside of that panel box, do you have an opinion as to the uprightness of the Exhibit 3 at the time that metal was melted? A. Yes.

"Q. What is it? A. The box was in upright position on the—or substantially so.

"Q. And why do you say that, Mr. Nelson? A. Because of the distribution and placing of the melding and fusing."

Mr. Ed J. Herron, State Fire Marshal of Iowa, was called as a witness by plaintiff. He had been State Fire Marshal since December 15, 1955. Before becoming State Fire Marshal he was the City Fire Marshal of Cedar Rapids. He had joined the Cedar Rapids Fire Department in 1938. He testified:

"Over the years, I have made many examinations after fires to determine the cause and origin of the fire. I am an executive board member of the Fire Marshal Section of the National Fire Protection Association, and a director of the International Arson Investigators. I have attended a number of short courses or special courses at Iowa State College and Purdue University.

"Q. Mr. Herron, in your determining the cause of arson, or the determining of the cause of fire, have you ever had experience where the fire itself was caused by the electrical system of the building? A. Yes. There are many fires that we have come to the conclusion that are in our opinion, after completed investigation, that were caused by faulty equipment or misuse of electricity. * * *

"Q. Now, Mr. Herron, have you ever investigated fires that you determined that the fire started from a placing of pennies in the fuse box? A. Yes. We have investigated fires where the cause was directly related to the placing of pennies in the fuse box.

"Q. And what does the placing of pennies in the fuse box do with regard to the electrical system, Mr. Herron? A. Well, the fuse is a safety factor, if the circuit becomes overloaded, or overheated, normally the fuse should blow out and prevent the electric circuit from being operative; when a penny is placed behind the fuse box it in effect short-circuits the fuse box and even though the services become overheated or overloaded it still continues to function until something in the service breaks down. * * *

"Q. * * * do you have an opinion as to the cause of the fire that happened at the Fort Des Moines Building 318, consumed the building? A. Yes.

"Q. And what is that opinion? A. Yes, in my opinion, the pennies in the fuses were the cause of the fire starting in the Fort Des Moines area, in this particular house.

"Q. Mr. Herron, you examined Exhibit 3 on or about February 25, 1956? A. That is correct.

"Q. And at that time that you examined it did you notice the pennies in the fuse wells? A. Yes.

"Q. Did the pennies that you saw in the fuse wells on February 26, 1956, did that give you that information at that time? A. Yes, it did. * * *

"Q. * * * with those facts [lengthy hypothetical question] and those facts only, are you able to form an opinion as to the cause of the fire that consumed Building 318? A. Yes, I believe I could.

"Q. And what is that opinion? A. Yes, in my opinion the

placing of the pennies behind the fuse caused, could cause and did cause the fire."

Under cross-examination Mr. Herron testified:

"Q. On what basis in this hypothetical question that was put to you, do you eliminate those other types of situations which could cause a fire whether the pennies were there or not? A. Because this would be a logical conclusion to reach; you would, there was a factor presented you know could cause the fire.

"Q. That they could cause a fire? A. That is correct, that was what I was asked. * * *

"Q. * * * Is it then the extent of your testimony here in the opinions that you have given, that the pennies in the fuse well could have caused the fire? A. That is correct. * * *

"Q. * * * Now, Mr. Herron, I believe just before we adjourned last evening you made a statement that the condition of the fuse box, Exhibit 3, could cause this fire; and then you made another statement that was as far as you were willing to go; at the time you made that statement, if I am quoting it correctly, were you confused by the question? A. Yes, I was. I would say I was confused if the question meant that that was as far as I would make an opinion on what caused this fire; because in my opinion it could cause the fire, but the pennies behind the fuses did cause the fire in this building. * * *

"Q. * * * What is your opinion this morning? A. That the condition with the pennies behind the fuses could and did cause the fire in this particular case."

Briefly, the content of the evidence of the experts was twofold: 1st. Because of the pennies in the fuse wells the fuse would not blow out, and in the absence of this safety valve and because of the heavy overload on the electric wires they became overheated. The insulation on the wire was destroyed by this overheating, the hot wire came in contact with the wall, or some other contacting substance, resulting in the fire. 2d. It was also the opinion of the experts, from the appearance of the wires and the melted metal in the fuse box, that the fire started in or near the fuse box.. In other words, a fire from some other area in the building reaching the fuse box would not cause the

type of damage which appeared evident. This could only happen from fire starting in or near the fuse box.

"Arcing" (Webster), in electrical language, is the luminous bridge formed by the passage of a current across a gap between two conductors or terminals.

Defendants called Kenneth R. Brown as a witness to refute the testimony of Messrs. Lagerstrom, Nelson and Herron. Mr. Brown is an electrical engineer, owner of Brown Engineering Company in Des Moines. He is a graduate of University of Illinois; worked for many years as an engineer for private corporations, but since 1932 has been in private engineering practice. He takes the opposite position from plaintiff's three witnesses. The answer as between the experts is for the jury.

■ 20 Am. Jur., Evidence, section 1206, states: "* * * it is generally recognized that the relative weight and sufficiency of expert and opinion testimony is peculiarly within the province of the jury to decide, considering the ability and character of the witness, his actions upon the witness stand, the weight and process of the reasoning by which he has supported his opinion, his possible bias in favor of the side for whom he testifies, the fact that he is a paid witness, the relative opportunities for study or observation of the matters about which he testifies, and any other matters which serve to illuminate his statements."

Vigorous objections were made by attorneys for all defendants to the lengthy hypothetical question asked Mr. Herron. The trial court overruled them.

■ The form and content of a hypothetical question are largely within the discretion of the trial court. We will not reverse the ruling unless this discretion is abused.

32 C. J. S., Evidence, section 551 b(1) states: "The form of hypothetical questions and the facts to be embraced therein are matters resting largely in the sound discretion of the trial court."

The ruling of the trial court on this question was correct.

We said in the Tedrow case, supra, at page 772 of 249 Iowa: "In order to make a jury question upon negligence, when the evidence is circumstantial, it must be such as to make the theory of the causation reasonably probable, not merely possible, and

more probable than any other hypothesis based upon such evidence."

This theory has become well established by many decisions. In the case at bar there is evidence the fire started in the southwest portion of the tavern.

Mr. Jack Davis, who was apparently the first man who saw the fire, and drove to the building, testified: " * * * the fire was concentrated in that part of the building that contained the tavern. At that time, I could not see any fire upstairs in the building * * * went all the way around the building and looked in the door that contained that part where you go into the dance hall. I went right up to the door so I could look in and when I looked into the building where the dance hall portion was located, that portion was not on fire. It was smoking, but no flame was visible. At this time, the north portion of the building had not been broke out into flame. * * * there was no fire that I could see in the portion of the building where the apartment was but the fire in the tavern portion of the building was burning strongly. When I first drove down Rogers Road, the fire was coming through the southwest corner of the tavern. When I came back from having the fire department notified, the fire was still contained in the southwest corner of the tavern * * *."

There was some conflicting evidence as to the place the fire started, but the evidence contrary to Mr. Davis' testimony was inconclusive. At any rate this would be a question for the jury.

■ When a case is based on circumstantial evidence and the theory advanced by plaintiff is more probable than possible, it reasonably presents an element of negligence on the part of defendant which should be submitted to the jury. Ruth v. O'Neill, 245 Iowa 1158, 66 N.W.2d 44; Carpenter v. Security Fire Ins. Co., 183 Iowa 1226, 168 N.W. 231; Lunde v. Cudahy Packing Co., 139 Iowa 688, 117 N.W. 1063; Roller v. Independent Silo Co., 242 Iowa 1277, 49 N.W.2d 838.

In Ruth v. O'Neill, supra, this court said (page 1173 of 245 Iowa): "The rule as to the amount of circumstantial evidence necessary to establish a fact, as recognized by this court, has always been the same though not always expressed in identi-

cal language. * * *it was sufficient if 'the proven facts and circumstances are such as to justify a reasonable inference that the negligence of the appellant was the proximate cause of the injury. This is all that the law requires.' "

In Carpenter v. Security Fire Ins. Co., supra, we said (pages 1233, 1234 of 183 Iowa):

"Whenever the evidence presented in support of any contention is such that it may, when fairly and honestly weighed and considered, produce a conviction in the mind that the fact exists as contended for, it becomes a question for the determination of the legal triers of fact. * * *

"The jury is bound to gather the truth from the evidence. If the theory which includes liability finds support—rational and reasonable support—in the evidence, the fact that reasonable minds might differ as to which of the two theories is better supported by the evidence does not justify the court in taking the case from the jury."

We quote from Lunde v. Cudahy Packing Co., supra (pages 699, 700 of 139 Iowa):

"It is true * * * that no eyewitness was produced to testify to the particulars of the accident * * *. This, say counsel, leaves the cause of the accident a mere matter of speculation or surmise, but such is not the case. More frequently than otherwise the truth or falsity of any disputed fact proposition is dependent, in greater or less degree, upon circumstantial evidence. * * *

"Proof of proximate cause is subject to no more burdensome rule than is applied to the proof of any other essential fact in an ordinary law action. It must be established by a preponderance of the evidence, direct or circumstantial. If there be shown any facts bearing upon the question and they afford room for fair-minded men to conclude therefrom that one theory of the case is better supported than the other, the question cannot be properly withdrawn from the jury."

In Roller v. Independent Silo Co., supra, at pages 1283, 1285 of 242 Iowa, the court said:

"We will go to the record and examine whether or not there were sufficient facts to warrant the jury to pass upon such matter. The facts need not necessarily be shown directly or by eye-

witnesses. They may be shown by circumstantial evidence. Also, by inferences which may arise from certain facts and circumstances shown. * * *

"There was a suggestion in argument by defendant that the insulation where the wires had been spliced might have been eaten into by rats. There is nothing in the record upon which to base such a claim. It would simply be speculation and conjecture."

In the former case of Hutchinson v. Des Moines Housing Corporation, supra, we considered the question of liability of a landlord when utilities are furnished as a part of the rental consideration, and damage arises because of defect. Margaret Anne was not a tenant, but was a guest in the apartment of a tenant. As a part of his salary as a custodian Mr. Tedrow was furnished his apartment and under the circumstances she was entitled to the same protection as a member of the family. We will not repeat our somewhat detailed analysis as contained in the former decision. We will only renew the citations: Glidden v. Goodfellow, 124 Minn. 101, 144 N.W. 428, L. R. A. 1916F 1073; Housing Authority of Birmingham District v. Morris, 244 Ala. 557, 14 So.2d 527; 52 C. J. S., Landlord and Tenant, sections 417 and 418; 32 Am. Jur., Landlord and Tenant, section 750.

The judgment on the ruling of the trial court directing a verdict in favor of defendants Des Moines Housing Corporation and Bruno Ceretti is affirmed. Such judgment as to Fort Des Moines Community Services, Incorporated, is reversed, and the case is remanded for new trial as to said defendant. The appeal costs shall be divided one half to plaintiff and one half to defendant Fort Des Moines Community Services, Inc.—Affirmed in part and reversed in part.

All JUSTICES concur.