JOHN ROTTLESBERGER, Appellee, v. A. J. HANLEY, Appellant.

**Evidence of value:** QUALIFICATION OF WITNESSES. Farmers who state that they are acquainted with the values of farm products and rentals are competent to testify on those subjects, the weight of their testimony being a matter for the jury.

**Contract of employment:** EVIDENCE: HARMLESS ERROR. In this ac-

tion for the alleged wrongful discharge of a farm hand employed under a contract by which defendant was to furnish him a house, any error in permitting plaintiff to show the rental value of another house which he was compelled to occupy after his discharge was harmless, where the court told the jury not to allow anything on account thereof but to confine recovery to loss of rental value of defendant's house.

Same.   Where plaintiff claimed that he was deprived of certain products by reason of his wrongful discharge from defendant's employ, evidence of the market value of such products during the term of the employment was proper.

Exclusion of evidence: PREJUDICE.   The exclusion of evidence which the party is subsequently permitted to introduce is not prejudicial.

Evidence: IMPEACHMENT.   A witness may be impeached by a showing of contradictory statements made by him.

Exclusion of evidence: PREJUDICE.   Exclusion of evidence in chief is not prejudicial, where the same matters are brought out on cross-examination.

Evidence: VALUE.   As bearing upon the value of personal property which has no market value, evidence of good faith offers to purchase such property is admissible, if for no other reason than to show the competency of the witness.

Contract of employment: BREACH: DAMAGES.   Where by plaintiff's contract of employment as a farm hand he was entitled to firewood and an interest in farm produce, his recovery on that account because of wrongful discharge was properly limited by the court to the value of his interest in the produce at the time of the discharge, and to the value of firewood as it stood in the timber.

Same: MITIGATION OF DAMAGES: INSTRUCTIONS.   After a servant has been wrongfully discharged he is under no obligation to return to the master's employment at his request; this matter is optional with the servant; and in this case the court's instruction that if defendant asked plaintiff to return to his service that fact could only be considered on the question of damages, was sufficient on the subject of mitigation, in the absence of request for a more specific instruction.

*Appeal from Johnson District Court.*—HON. R. P. HOWELL, Judge.

MONDAY, JUNE 10, 1912.

ACTION to recover compensation for labor performed; damages for the wrongful discharge of plaintiff as a farm hand, and for the board of farm hands kept at defendant's request. Defendant admitted that he was owing plaintiff $40 for labor performed, but denied all other claims. He also pleaded a counterclaim for damages growing out of the charge that plaintiff without cause quit his (defendant's) employ; and for negligently and carelessly caring for defendant's stock to his (defendant's) damage. On the issues joined the case was tried to a jury, resulting in a verdict for plaintiff in the sum of $170. There were also two special findings to the effect that defendant discharged plaintiff, and that he had no sufficient ground for so doing. Defendant appeals from the judgment rendered on the verdict.—*Affirmed.*

*Milton Remley* for appellant.

*Ranck & Messer* for appellee.

DEEMER, J.—Defendant is the owner of a farm or stock ranch in Johnson county, Iowa, and on or about the 16th day of March, 1909, he employed the plaintiff to perform certain work and labor upon this farm for the term of one year, agreeing to give him the sum of $275 per year, payable monthly, and also to furnish him a house in which to live, firewood, one-half of the eggs from the poultry, one-half the chickens raised, one-half the milk, and one-half the butter from the cows; also, the use of a truck patch of three or four acres, and all the vegetables, etc., raised on this patch. Plaintiff immediately entered upon the work, and he claims that on or about July 9, 1909, defendant wrongfully and without just cause discharged him. He avers that, when discharged, defendant

was owing him $40 for services already performed, and that by reason of his wrongful discharge he was damaged in the sum of $200. He also claims that at defendant's request he boarded two hands for him while he was upon the place, and that for this he was entitled to the sum of $36. He further claims that after his discharge it was agreed between him and defendant that he (defendant) would pay plaintiff, for plaintiff's interest in the chickens on the farm, the reasonable value thereof, which is alleged to be $10. The defendant admits that he employed plaintiff as a farm hand, but he does not agree with plaintiff as to the exact terms of the agreement. He admits that he was to pay the sum of $275 per year, furnish a house and certain firewood and some of the produce from the farm, and avers that plaintiff commenced work for him under contract made in the year 1908, which was carried over by agreement into the next year with certain modifications. He admits owing plaintiff $40 for labor performed, and pleads that plaintiff, without cause, quit his employment, causing him damage, and that he neglected to give his live stock proper care, resulting in the death of some of the animals and injury to others, to his damage in the sum of $105. He admits that plaintiff boarded certain hands for him, but alleges that he was to have all the milk, butter and eggs during the time he so boarded them in full compensation for the board furnished. He denies the claim of plaintiff as to the poultry, and says that plaintiff is not entitled to anything save what he has had. He also claims that by reason of plaintiff's quitting his employ he was damaged in the sum of $80. The reply denied each and all the allegations of the counterclaim. It was upon the issues thus tendered that the cause was tried, resulting in the verdict before stated with the answers to the special interrogatories. Something like ten errors are claimed to have been made by the trial court in this comparatively simple case. We shall not consider all

of the assignments, as to do so would unduly extend this opinion. The main issue of fact was whether or not defendant wrongfully discharged the plaintiff. The jury found affirmatively that he did, and this was the basis for the general verdict. This finding has support in the testimony, and we shall not interfere unless we discover some errors which materially affected the result.

I. First we shall consider some of the rulings on testimony. Plaintiff and his wife were each produced to testify over objections to the value of certain cabbage, etc.,

1. EVIDENCE OF VALUES: qualification of witnesses.

growing in the truck patch, to the rental value of the house on the farm, and as to the worth and value of butter and firewood, and it is claimed that these rulings were erroneous because neither showed any competency to so testify. These witnesses were both farmers, had raised some of the products, and each testified that he knew of the values of the items testified to. Having shown some competency, their testimony was admissible; its weight being for the jury. *Anderson v. Railway Co.*, 84 Neb. 311 (120 N. W. 1114, 133 Am. St. Rep. 626); *Tubbs v. Insurance Co.*, 131 Iowa, 217; *Houghstaling v. Railway Co.*, 117 Iowa, 541; *Thomason v. Insurance Co.*, 92 Iowa, 72; *Tubbs v. Garrison*, 68 Iowa, 45.

Over objection plaintiff testified to the rental value of the house in Iowa City which he was compelled to rent after leaving the farm. In view of the fact that

2. CONTRACT OF EMPLOYMENT: evidence: harmless error.

defendant was allowed to offset plaintiff's net earnings after he left the farm against the amount of his damages for discharge, this testimony was doubtless admissible. In any event, it was nonprejudical, for in the instruction plaintiff was limited in his recovery to the value of the loss of the rental of the house on the farm, and the jury was specifically instructed not to allow the amount which plaintiff was required to pay for the house which he pro-

cured at Iowa City.   The error, if there was one, was
entirely without prejudice.

Another witness was permitted to testify as to the
rental value of the house on the farm, and it is said that,
she had shown no competency to answer.   There is an
evident mistake as to what the witness said in this regard.
The record shows that the witness testified that she knew
the rental value of the house.

Witnesses were permitted to testify as to the market
value of butter and potatoes during the months from
3. SAME.   July to December of the year 1909.   This
testimony was material and competent.   Ac-
cording to plaintiff's theory, he was deprived of both by
reason of his wrongful discharge.

It is argued that the court erred in rejecting the
testimony of one Calkins, who was plaintiff's representative
4. EXCLUSION OF   during part of the time that the controversy
EVIDENCE:   between the parties was raging.   To under-
prejudice.   stand this point it is necessary to quote from
the record the following:

I am an attorney, and acquainted with John Rottles-
berger.   He came to see me with reference to his claim
against Hanley, and at his request I went to see Mr. Han-
ley, and told him that I represented Mr. Rottlesberger.
Q. What, if anything, did Mr. Hanley say to you with
reference to Rottlesberger quitting him?   (Objected to as
incompetent, and the further reason it is a confidential
communication, and that he stood in that relation, the
declaration of Mr. Hanley to this witness would not bind
the plaintiff; incompetent, irrelevant, and immaterial.   Sus-
tained.   Defendant excepts.)   Q. After seeing Mr. Hanley
did you see Mr. Rottlesberger?   A. Yes, sir.   Q. After
seeing Mr. Hanley, did you have a conversation with
Rottlesberger about continuing work there?   (Objected to
for the same reason as last.   Sustained.   Defendant ex-
cepts.)   By Mr. Remley: I propose to show that Mr.
Rottlesberger employed Mr. Calkins to try to adjust this
claim, and Mr. Calkins went to see Mr. Hanley, and Han-

ley told him that he had not discharged him, and he wanted him to continue his work and complete his contract, and that Calkins then saw Rottlesberger and told him, and Rottlesberger said his wife was not satisfied there and he would not stay any longer, and that Mr. Hanley told him that it was hard to get a man at that time, and it was not right for him to quit, and he wanted him to go on, and Mr. Calkins communicated this fact to Mr. Rottlesberger, and he refused to do it. I propose to show that this was before Hanley knew that Rottlesberger had quit, and that it was on Monday morning after the time that Rottlesberger says that Hanley told him to quit. I will say, in this connection, that Mr. Hanley told Calkins to tell Rottlesberger that he did not know where he could get another man to take his place and wanted him to continue, and that he would not try to get anybody else until he made a definite answer; and that Mr. Rottlesberger told the witness in reply that his wife was dissatisfied and he would not stay any longer, and that witness communicated to Hanley what Rottlesberger said. By the Court: There isn't any question but that Mr. Caulkins was representing Mr. Rottlesberger at the time? By Mr. Remley: No, sir; it is conceded that Mr. Calkins was representing the plaintiff at the time this testimony is sought to be given. A. I was sworn in this case this morning and was on the witness stand. By Mr. Ranck: I want to ask the witnesss a question as to whether or not he was the attorney at the time for Mr. Rottlesberger. By the Court: You may do so. By Mr. Calkins: I suppose I was employed by Mr. Rottlesberger. I talked with him about the matter. I was employed to look after his interests. I charged him $2 for my services, and he paid part of it. (Examination of witness Calkins continued by Mr. Remley:) Mr. Hanley said to me he wanted John to remain on the farm or go back and complete his contract, and I told Mr. Hanley that John's wife did not want to stay there and he didn't want to go back and he declined to go and stay there. I saw Hanley once personally, and talked over the phone with him once. Rottlesberger came to my office to see me after I had talked with Hanley. I think he told me to tell Hanley he would not go back to work. I never saw Mrs. Rottlesberger. (Cross-examination:) I am in the same office with Mr.

Remley.  Have talked this over a number of times with him.  I know Hanley was Remley's client at the time Rottlesberger saw me.  I was doing business in Remley's office.  All the matters I told Remley I got from John Rottlesberger when he was my client.  I have a rear room in Remley's office.  It was there John talked with me.

The record in its entirety shows that the witness was permitted to testify to the very matters which defendant sought to show by him.  Again, the defendant, while on the stand as a witness on his own behalf, testified without objection to the conversation he had with Calkins.  The conversation with the client may have been confidential; but, even if it was, defendant had the full benefit of it and is in no position to complain.

A man by the name of Mason was one of the farm hands for whose board plaintiff sought to recover.  He was a witness for the defendant and testified to the bad char-

5. EVIDENCE:  acter of the board, plaintiff's misuse of de-
impeachment.  fendant's property, and his lack of attention
to and care of the truck patch, also as to the returns in the fall from the garden, etc.  This witness was sought to be impeached by showing contradictory statements made by him, and in this there was no error.

Mason also testified that plaintiff's wife called him a liar, and that plaintiff ordered him off the place, and on cross-examination the following occurred: "I took a jug

6. EXCLUSION OF  of whisky up to the place up there.  It is
EVIDENCE:  not true that John and his wife objected
prejudice.  to my coming into the house intoxicated on
different occasions and that they called my attention to it.  I didn't get drunk up there."  Upon rebuttal the following record was made: "Mrs. Rottlesberger testified: Q. You may tell the jury, when Mr. Mason was at your place when he was boarding there, whether at any time he was intoxicated.  (Objected to as improper cross-examination, immaterial, and if they ask Mason about an im-

material matter, they can not impeach or contradict it. We are not going to try Mason in this action; no issue of that kind having been raised. Overruled. Defendant excepts.) A. Yes, sir; I saw him intoxicated while boarding there three or four times. Q. Now, was he up in the house intoxicated while at the dinner at any time? (Objected to as immaterial. Sustained. I thought you had reference to the time he quit boarding there or any difficulty that arose at that time. This is the theory upon which I allowed the first question to be answered. Exception saved.) A. When Mason boarded with us, we had on the table bread, butter, potatoes, and meat, and several times a week pie, coffee, fruit. Our grocery bill during the time he was with us was $32.68." On cross-examination witness testified: "We had beer at our house while Mason was there; had one case. I think Mason drank a bottle of it. Mason was intoxicated the night he came there to work. Also the latter part of May and the 12th of June. Anybody could tell it."

It is evident from this record that no prejudice resulted. The court in effect excluded the testimony as to drunkenness, and the matter was brought back into the case by the cross-examination.

The last ruling on testimony to which we shall refer arises out of the following record: Plaintiff's wife was a witness, and testified on direct examination to the value of the growing potatoes on July 11, 1909. On cross-examination the following record was made: "I estimated the value of the late potatoes by the thriftiness of the plants. I did not estimate the number of bushels the rows of potatoes would produce. I never heard of potatoes being sold in the ground that way. I do not know the market value of that patch, as it was growing there. I said I knew the market value of early potatoes. We would value them at $10, my husband and I. By Mr. Remley: Now, if the court please, this is not competent

7. EVIDENCE: value.

evidence, and I move to strike out all her testimony in regard to the value of these potatoes. By the Court: In the present state of the record, it may go out. (Exception saved.) We had six rows of early potatoes eighty feet long and about (indicating) apart. They were plowed twice and hoed three or four times. Potatoes were seventy-five cents per bushel at that time. I fixed the market value of those potatoes from what were in the two hills we used for dinner that day. We got a half gallon out of two hills." On re-examination we find this record: "Q. Mr. Remley asked you about the late potatoes. He wanted to know what these late potatoes were worth when you left. Can you give any additional reason how you know what they were worth? Did anybody make you an offer for these potatoes? A. Yes, sir. Q. How much? (Objected to as incompetent, not what some person offered. Overruled. Exception saved.) A. Mr. Harvey King offered us $15 for our patch of potatoes. If we had stayed there, we would have used these potatoes ourselves, and it would not have cost us anything to dig them." Recross-examination: "Harvey King offered us $15 for the patch of potatoes. That was the next week after we moved."

In this record we find no error. In cases involving the value of personal property which has no market value, bona fide offers for such property are admissible; if for no other reason to show the competency of the witness. *Faust v. Hosford*, 119 Iowa, 104; *Clausen v. Tjernagel*, 91 Iowa, 285; *Joy v. Insurance Co.*, 83 Iowa, 12.

We had much difficulty, on account of the numerous amendments to, and corrections of the abstract, in ascertaining the exact record. Have been compelled to go to the transcript, and, if there be any misstatements as to what actually occurred, it has been due to the very confused record which might have been made perfectly plain in the first instance.

II. Many of the instructions are complained of, but

the only ones to which there are specific objections are the eleventh, twelfth, fourteenth, fifteenth, and twenty-third.

8. CONTRACT OF EMPLOYMENT: breach: damages.

All except the twenty-third have reference to special items of damages, as the rent of the house; loss of vegetables, potatoes, etc.; loss of butter, milk, and eggs; loss of the increase in poultry; and loss of firewood. As to growing produce, the instructions limited plaintiff's recovery to their value at the time of plaintiff's discharge. As to the poultry, plaintiff was limited to recovery upon an express contract of defendant to pay the reasonable value thereof at the time he left the farm, and as to the firewood the reasonable value thereof in the timber, without express limitation; although the petition, the substance of which was stated by the court, made claim to firewood during the time covered by the lease. In this there was no prejudicial error. The testimony showed the firewood was worth from $2 to $3 per month. No instructions were requested by defendant on this point, and in the absence of request there was no error in giving the general one of which complaint is made. The plaintiff's recovery as to this item, if any, was the value of the firewood in the timber as stated.

Instruction twenty-three reads as follows: "There has been testimony introduced in this case by the defendant to the effect that he asked the plaintiff to go back to work

9. SAME: mitigation of damages: instructions.

and complete his contract. If defendant has shown you by the evidence he did so ask the plaintiff to go back to work, this fact, if it be a fact, may be considered by you in determining the amount of damages due plaintiff, if any, for loss of time; but you are instructed, if you have found that plaintiff was discharged by the defendant, that plaintiff was not under legal obligation to again enter the employ of the defendant, and that this testimony can only be considered

by you with reference to the claim of damages for loss of time."

As opposed to this, defendant asked the following:

(4) You are instructed that if, after the plaintiff claims defendant told him to quit and the defendant requested the plaintiff to remain and continue the work and to comply with his contract, and the plaintiff refused so to do, if you so find, then the defendant is not liable for damages for wrongfully discharging the plaintiff; but, on the other hand, the plaintiff is liable to the defendant for all expenses and additional costs incurred by the defendant in procuring the work contracted to be done by the plaintiff in excess of the compensation agreed to be paid to plaintiff to be done by other persons, and you should so find. (4½) The plaintiff claims that he was discharged from the defendant's employ on Sunday, July 11, 1909. The defendant denies this, and claims that he did not discharge the plaintiff on that day, and, further, that he insisted on Monday, the next day, that the plaintiff should continue his employ and complete his contract. Now, you are instructed that if you find the plaintiff was requested by the defendant to complete his contract and continue in his employ upon the same terms, and that defendant gave him an opportunity for so doing, then plaintiff is not entitled to recover any damages by reason of the alleged discharge of the plaintiff by the defendant.

These were each refused, and of these rulings complaint is made. This assignment of error presents the only debatable question in the case. The rule announced by the instruction given as to the duty of plaintiff to return after a wrongful discharge is undoubtedly correct; and the doctrine set forth in the fourth request is wrong. A servant once wrongfully discharged is not compelled at his peril to resume his employment at the master's subsequent request. It lies with the servant as to whether or not he will accept the master's repentance. *Mitchell v. Toale*, 25 S. C. 238 (60 Am. Rep. 502); *Youngberg v. Lamberton*, 91 Minn. 100 (97 N. W. 571).

The fourth request negatives this idea, and in that respect it is incorrect. The instruction given is not perhaps as explicit as it should have been regarding the exact effect the request to return should have on the measure of damages; but this is not the complaint lodged against it. Defendant says that under the assumed facts plaintiff would not be entitled to recover anything for loss of time; but this, of course, is not true. In the absence of more specific request on the subject of mitigation of damages, there was no error of which defendant may justly complain.

In this connection, instruction No. 22, reading in this wise, should be considered. "Now, you are instructed that plaintiff claims that he was discharged by defendant without just provocation, and that he had complied with the terms and conditions of his contract with the defendant; but defendant denies this, and claims that along in May plaintiff became careless and refused to obey directions of the defendant, and that he neglected the stock, etc. Now, you are instructed that, if plaintiff broke his contract in any way, this would be sufficient grounds to warrant the defendant in discharging him, and that the plaintiff could recover no damages by reason thereof and would be entitled to nothing except the amount due him at the time he was discharged."

III. Lastly, it is argued that the verdict is without support in the testimony. To this we can not agree. There was enough to take the case to the jury upon every proposition submitted. The amount involved is small, and the verdict not excessive, yet counsel have presented every imaginable question, and, notwithstanding the comparatively small record, we have been put to unusual labor in trying to solve the many alleged errors presented.

Finding none that seem to be prejudicial, the judgment must be, and it is, *affirmed*.