RICHARD RUTH et ux., appellees, v. PATRICK O'NEILL and CAPITOL IMPLEMENT COMPANY, a corporation, appellants.

No. 48481.

(Reported in 66 N.W.2d 44)

SEPTEMBER 21, 1954.

D. C. Nolan and William M. Tucker, both of Iowa City, for appellants.

Tomasek & Vogel, of Grinnell, and Messer, Hamilton & Cahill, of Iowa City, for appellees..

BLISS, J.—Plaintiffs are husband and wife. About October 1, 1951, Richard Ruth leased and began operating a rural petroleum products service station about ten miles south of Iowa City, Iowa, on Highway 218. On October 27, 1951, the young couple were married and shortly thereafter moved into the service station and made their home there. In addition to some farm work which the husband did, plaintiffs operated the leased property as a combination grocery store, lunch counter and service station. They handled petroleum products of the Skelly Oil Company, which were delivered to them by the defendant Capitol Implement Company, a corporation. In making deliveries it used its own General Motors truck on which was mounted a five-compartment tank carrying the various grades of gasoline, fuel oil and lubricants. Defendant O'Neill was employed by his codefendant

to operate the truck and make the deliveries. The Skelly Oil Company was made a party defendant but the jury returned no verdict against it, and it is not a party in this appeal. The appellants had been making their deliveries to plaintiffs from October 1951 to March 6, 1952. On the latter date O'Neill delivered the ethyl gasoline which plaintiffs alleged overflowed the tank he was filling and ran into the basement of the service station, and the gas given off from the gasoline was ignited by the pilot light of the hot-water heater or a spark from the air compressor motor and exploded and set fire to the building and its contents. This action is just for the loss of the personal property contents owned by plaintiffs. The loss so sustained by them they alleged was caused by the negligence of the Skelly Oil Company and the two appellants. They prayed judgment for $10,416.16 with interest and costs. The jury found for plaintiffs and against the appealing defendants and assessed plaintiffs' recovery at $4633.32, for which judgment was entered. The pleadings of defendants for the most part were denials.

Some further description of the property is necessary for a proper consideration of the contentions of the parties. At the location of the service station, Highway 218 is laid out in a north-south direction. The station building was on the east side of the highway and it faced or fronted west toward the highway approximately at right angles. The construction of the building was the handiwork of the owner. It was of frame construction with concrete foundation and basement walls. In 1931 the owner built the first part of the building, 14 feet north and south on the front by 18 feet from west to east with an "L" 9 feet by 11 feet extending to the north. He constructed a concrete pavement from the front of the building 20 feet west, and placed thereon, about 10 feet from the building, a raised island of cement on which the gasoline pumps were erected. Between the paved surface and the pavement on Highway 218 a crushed rock or gravel driveway was constructed. An open shingle canopy was built from the front of the building out over the pumps.

In 1937 the owner made this structure into an approximately square one-story building about 30 feet by 30 feet, by extensions to the north and east of the part built in 1931.

The only entrance to the building was on the west front by a door somewhat north of the halfway line of the front. There was a basement approximately under the south half of the building. In the southwest corner of the building on the first and only floor thereof was a room used for an office and a lunchroom. Along the east side of this room was a lunch counter, on the west side of which were stools for the patrons. There was a window in the south wall of the room. Adjoining and just east of this room was the kitchen, from which there was a stairway to the basement. There was also a window in the south wall of this room. The windows were two or three feet from the floor. Adjoining and just east of the kitchen and in the southeast corner of the building was the living room. These three rooms occupied all of the south part of the building. North of the living room was a bedroom, and west of the bedroom were rest rooms, washrooms and rooms for heating and pumping equipment.

At the northwest corner of the building was an underground tank for the regular gasoline and also a fifty-gallon barrel for fuel oil for heating purposes of the station. Near the southwest corner of the building and south of it was an underground tank for the ethyl gasoline. About eighteen inches east of the southwest corner of the building was a window in the south basement wall about a yard long and a foot high. Some distance farther east was another basement window of the same dimensions. These windows were hinged at the top so that they could be opened inward. They were fitted rather loosely leaving a crack about an eighth of an inch wide at the sides and bottom of each window to better ventilate the basement and eliminate moisture. Outside and in front of these two basement windows was a window well about a foot deep and extending away from the building about the same distance. The bottom of the well was on the same level as the bottom of the window. Earlier in the winter Mr. Ruth had shoveled snow into the westerly window well, which ran in the basement when it melted through the crack below the window. Along the south wall of the basement the foundation was so constructed as to make a shelf-like ledge about four feet from the basement floor, and extending into the basement. On this ledge and part way under the westerly basement window was an

air compressor, the pump of which was automatically operated by electricity. When the air pressure in the tank fell the pump was started. There was a large air tank below the compressor.

There were two rest rooms in the basement and a large room divided by a north-south partition made of sheet rock which extended from about six inches above the floor to about six inches from the ceiling, so as to permit air circulation. On the east side of this partition was a thirty-gallon hot-water heater. The fuel for heating the water was bottled gas contained in bottles outside and south of the building. The gas was piped from the bottles to the hot-water heater. This heater was automatic and a pilot light beneath the heater burned continuously even when the heater was not in operation. In the basement was a washing machine, tubs and other laundry equipment. Soft drinks and other lunchroom and grocery supplies were also stored in the basement.

The pipe for filling the ethyl gasoline tank and the air vent from the tank were about six feet directly south of the westerly basement window. The upper end opening of the intake pipe was about six inches above the surface of the ground and was closed by a hinged cap which could be padlocked, but seldom was. The air vent pipe, above the ground, formed two right angles, with the opening toward the ground to prevent rain from entering. It was about six inches above the ground. Both pipes were close together. The two ends and the outside wall of the window well were of cement. Richard Ruth testified that the tops of these walls of the window well were about flush or level with surrounding surface of the ground, or somewhat lower. Testimony for defendants was that the walls of the window well formed a collar a few inches higher than the ground. The owner of the building, who was a witness for each party, as a witness for defendants testified that he had constructed the window well curbs or walls about four inches above the ground, but later had filled in and graded dirt and gravel about the building. It was undisputed that the ground from the air vent and filling pipes sloped north and somewhat east toward the westerly basement window. Water during rains had run into the basement from this window well.

O'Neill arrived to make his delivery to plaintiffs' station about 10 a. m. of March 6, 1952. There were about two inches of snow on the ground, and the outside temperature was about 32 degrees Fahrenheit above zero. Mr. Ruth was not at the station. His wife was the only one in charge. It is undisputed that O'Neill stopped his truck at the northwest corner of the station and filled the fuel barrel and the regular gasoline tank. He then took the truck to the southwest corner of the building and put the nozzle of the hose from the ethyl gasoline compartment of the tank into the intake pipe of the underground tank. The gasoline did not flow by gravitation, but was pumped in by the motor of the truck. The speed of the filling could be regulated either by a device in the nozzle or by the motor. The usual delivery to this tank was 150 or 200 gallons. It ordinarily took from ten to fifteen minutes to fill this tank. It is undisputed that O'Neill after starting the gasoline to flow went into the lunchroom for something to eat and drink and to chat with Mrs. Ruth. She was behind the counter and O'Neill sat on a stool on the west side of the counter. Mrs. Ruth testified:

"After he came into the station, he smoked several cigarettes, ate two cups of ice cream and a candy bar, and talked with me and we looked at snapshots and he must have been there I suppose ten or fifteen minutes. After he ate the ice cream, he shouted, 'Oh, my God, the tank's overflowing'. He jumped up and ran out, and I looked out the double window on the south side of the west side of the counter. When I looked out the window I saw red gas flowing all around the ground on the snow. Sitting on the stool I could not see the ground clear up to the wall of the building. I could see the ground about half way between the fill pipe and the building. As much of the ground as I could see was all covered with this ethyl gasoline so that the entire area between the fill pipe and the building which I could see was covered with gasoline. * * * I then went to the kitchen and when I looked out of that window I saw the red gas flowing on the snow all around there, like a complete circle around the fill pipes. * * * From this window I could see more of the ground closer to the building than from the window in the station part of the building. All of the area that I could

observe between the fill pipe and the basement or foundation wall was covered with ethyl gasoline. * * * At this time the thought came to my mind, why should we have to pay for gas that Mr. O'Neill runs over on the ground, and I started to slice an onion for some stew, and I think it was around three or four minutes and a loud explosion or a gust of wind came through the house and I picked up everything and set it down again. * * * When this happened I ran to the door and there I met Mr. O'Neill and we both asked each other what happened. Neither of us knew. At this time he looked over and said, 'Oh, my God, there's a fire', and he grabbed a fire extinguisher which I gave him and he took it out and his boots caught on fire. When he made the above statement, I looked out the window on the south side."

Mrs. Ruth then tried to telephone but could not get the operator. As she stood at the telephone near the south window, just above the westerly basement window near the fill pipe, the flames were coming up the window at her side. O'Neill then said, " 'Let's get out of here', and we did." When Mr. O'Neill went out with the fire extinguisher the gasoline on his five-buckle overshoes caught on fire and he had to stop and use the extinguisher on that fire. The fire spread rapidly over the south side of the building and over the roof to the canopy and the gasoline pumps. The wind was from the southeast. Two fire companies arrived and extinguished the fire before the building was completely destroyed. The north part was the last to burn. The building was well gutted by the fire, and its contents were destroyed or damaged beyond use. Mrs. Ruth escaped with a few things in her arms, one of them being her wedding dress which was somewhat scorched. O'Neill moved his truck away from the building.

One or two farmers who reached the fire early testified that it appeared to have started on the south side of the building. Mr. O'Neill corroborated much of the testimony of Mrs. Ruth, and his denials of other parts are not persuasive. He admitted putting the nozzle of the hose from the ethyl gasoline compartment into the intake pipe and starting the motor pumping, probably in slow speed. He testified:

"I don't remember just what I did when I went into the oil station. I probably smoked some cigarettes. I recall visiting with Mrs. Ruth and she showed me some snapshots of the wedding and the trip. I was sitting on a stool at the lunch counter. Mrs. Ruth was seated on a stool on the other side of the counter. As I was sitting there visiting and eating ice cream and smoking cigarettes the truck outside was pumping the ethyl gasoline. * * * I heard Mrs. Ruth testify of my exclamation, 'My God, the tank is overflowing.' I don't know whether I made this statement, because I don't remember what I said, or if I said anything, but I won't say that I didn't say it, and I won't say that I said it either."

That was in cross-examination. On direct examination, he testified:

"I don't think I said that it was overflowing, but I might have said it was full, because the tank was empty and it had quit flowing. There wasn't any gas overflowing out around the intake pipe when I went out right after this. There is always gas spilled around the fill pipe and sometimes it comes out through the air vent when you're filling. I don't believe there was any flowing around on the ground or running around on the ground. There was gas on the ground, you could see it. I don't have any idea how much gas was on the ground because it doesn't take very much gas to look like a lot. I couldn't say whether it did or did not overflow and run out on the ground. I could see gasoline there on the snow. I don't remember how big a distance around the intake pipe that I could see the gasoline. It wouldn't be too big because it didn't go very far around the fill pipe."

But he admitted the tank was filled when he went outside and that he rolled up the hose, and as he was returning to the station he heard the explosion and took the fire extinguisher and tried to put out the fire and that as he did so his overshoes blazed up. He testified:

"I first went to the south side of the station, but when I got there the flames were going up the south side of the building. I would say this was about right east or between the two windows there. The flames covered quite an area east and west there at that time. These flames would be about half way in the building

going west. They were down right underneath the board siding. From the place where I first saw these flames, the wind just took it then, and it went right straight across the corner of the building towards the west."

The gasoline was being metered into the tank. There was no measuring gauge on the underground tank. The defendant had a metered record of just how much gasoline had been withdrawn from the truck tank. We may assume that if this amount would have been helpful to them they would have introduced evidence of it, but they did not. Richard Ruth testified that he arrived at the fire when it was under control, and examined the intake pipe and "saw that it was full and the lid was open." He said that the gasoline was at the top of the intake pipe so that he could touch it with his finger. The owner of the property made the same examination and said the pipe showed the tank was full. Mr. O'Neill testified that any overflow of gasoline would have been toward the building. Other witnesses so testified. Several neighbors and the owner of the property cleaned out the debris in the basement and about the station a few days after the fire. They testified that at that time the basement smelled strongly of gasoline and gas vapor.

Plaintiffs attached to their petition as exhibits itemized lists of the clothing, household goods and articles and merchandise which they had for sale, with prices or figures opposite each article representing what they thought was their fair and reasonable value at the time it was destroyed by fire on March 6, 1952. The petition was filed February 6, 1953, and the trial began May 18, 1953.

Dr. Lionel K. Arnold of the faculty of Iowa State College at Ames, Iowa, a specialist of extensive research and practical experience in chemical engineering and the study of flammable liquids and gases, as an expert witness for plaintiffs, in answer to a hypothetical question with its factual basis conforming to the evidential record herein, gave it as his opinion that the explosion and resulting fire were caused by the ignition by the pilot light, or a spark from the compressor motor, of gas from the gasoline overflowing into the basement.

▬ I. Defendants rely upon four errors for reversal. We

will discuss first the error assigned in permitting Doctor Arnold to give his opinion, as an expert,. of the probable cause of the fire, over defendants' objections. In substance these objections were that: the question assumed facts not shown by the record, and excluded pertinent facts in the record; the witness was not competent to express an opinion and the question was improper in that it invaded the province of the jury; and assumed there was gasoline and gasoline vapor in the basement which was ignited by a spark from the starting or stopping of the compressor motor, or by the pilot light of the hot-water heater, when there was no evidence of these facts.

The record amply shows Doctor Arnold's qualifications with respect to the subject matter concerning which he was interrogated. He received a Bachelor of Arts degree from Ellsworth College, his Bachelor of Science degree in 1921 from Iowa State College, his Master of Science degree in 1926, and his Doctor of Philosophy degree in 1930. Since 1921 he was engaged in the practice of engineering generally and during this time he specialized in chemical engineering. He made intensive study and research respecting the hazards of gases and explosives as related to fires. This study started many years ago in the school for firemen promoted and held at Iowa State College. He was an instructor and lecturer in that school. Later he was in extensive demand by individuals and concerns as a consultant in problems involving fire and explosions, when technical advice was needed. During the past twenty years he continued his special studies of gases and flammable liquids as they related to the causing of fires, and fire prevention. Some of these investigations were referred to him by the Iowa State Fire Marshal. He mentioned twenty of such investigations. His investigation in the case at bar was the fourth one in 1953 involving explosion and fire, and there were others in which he made studies and reports as to the cause of the combustion and fires.

With respect to gasoline, he testified: "Gasoline is a flammable liquid. Liquid gasoline itself does not explode, but the gasoline vapor, in proper mixtures of air or oxygen, is explosive when ignited. An explosion is a burning with such rapidity that the products of combustion as well as some of the surround-

ing air become heated and expand with enough force to be noticeable or violent. Several factors determine the violence and intensity of the explosion. These factors are things such as gas or vapor, relative amounts of it, and air, and whether or not it is confined or out in the open. Gasoline vapor becomes explosive when it becomes mixed with the proper amount of air or oxygen. The 'flash point' of gasoline is the minimum temperature at which enough of the liquid will vaporize so that a flammable mixture of vapor is present above the liquid. This means the atmospheric temperature at which gasoline, if it is exposed to the atmosphere, will give off vapors that will mix with the air, which vapors in turn will become flammable. It is not the temperature at which the vapors ignite. It is the temperature at which you get the explosive mixture present which can be ignited. The flash point of gasoline is about minus fifty degrees or fifty degrees below zero. In other words, if gasoline is exposed to temperature in the atmosphere which is fifty degrees below zero or at any temperature warmer than that, it will give off vapor. * * * There is a certain range of mixtures of vapor and air which will be flammable or explosive; if the concentration of vapors is below or above that range of mixtures, the mixture cannot be ignited or exploded, and that range over which it can be ignited or exploded is spoken of as the flammable or explosive range. The explosive or flammable range of gasoline vapors is usually considered as one and six-tenths per cent to six per cent by volume in air. Thus, when gasoline vapors mix with the air and such vapors constitute a percentage of between one and six-tenths per cent and six per cent, then such a mixture is flammable and will explode if there is an igniting agent. The ignition temperature of gasoline is usually stated to be at 495 degrees; by ignition temperature, I mean the minimum temperature at which gasoline vapor will actually ignite, assuming that you have a vapor there in the proper proportions of air. It is the temperature of the flame or spark, or whatever you are using, to ignite it."

The witness testified that temperature of a flame on the pilot light of a water heater, for which the fuel was bottle gas, and also the temperature of the spark which occurs at the

switch of an electric motor on an air compressor at the time it kicks on and off would be sufficiently high to ignite gasoline vapors. He also testified that the weight of gasoline vapor is from three to four times the weight of air.

This question and answer appear in Doctor Arnold's testimony: "Q. If gasoline is released or poured into the atmosphere, as for example by the overflowing from a fill pipe to an underground storage tank, which extends usually six or seven inches above the ground, now, in what direction, if any, will the vapors given off by the gasoline move? A. The vapor, being heavier than air, would go down and follow along the surface of the ground or pavement, whatever it falls upon, following along to a lower position. In other words, it flows downhill much as water does." Objection to the question and motion to strike the answer were overruled.

After so testifying to the qualities and attributes of gasoline, both regular and ethyl, and of the vapor or gas therefrom, and the factors and elements essential to cause it to explode, the doctor was asked the hypothetical question. It is too long to state in full, but it will suffice to say that after an adequate summation of the factual situation and circumstances as set out herein, and the assumption of their actuality, the witness was asked if he had an opinion as to the probable cause of the fire. Objection was made to the question on the grounds hereinbefore noted. The ruling of the court was: "As the court recalls the testimony it is of the opinion that the hypothetical question contains the substance of the testimony offered so far, and the objections of both defendants are overruled."

The witness answered: "Well, what I believe happened was that the gasoline overflowing from the fill tank flowed over— both the gasoline as a liquid and the vapor above it—flowed over to this window well, the one that has been referred to here in this position at the southwest corner of the building (indicating on Exhibit 2), and that gasoline from the window well in the form of vapor and some in the form of liquid entered the basement around the rather loose window which was there, and that a concentration of gasoline vapor collected in the basement, such concentration as was explosive, and that it was ignited either from the compressor starting or stopping, or from the pilot light

on the gas hot-water heater; that an explosion resulted and that the flames flashed or kicked back through the window opening, ignited the gasoline in the well, and then of course there was some along the building and it started burning and that ignited the wood of the building, and from there on it was more or less a normal fire."

By the term "flash back" the witness explained that if gasoline or gasoline vapor flows from some source off at an appreciable distance and it ignites somewhere along that stream the flame will flash back or move back along the path followed by the stream.

Defendants in cross-examining the witness argued that it was just as probable that the explosion and fire came from the bottled gas as from the gasoline. In this court defendants make the same contention, in that, since plaintiffs' case was based largely on circumstantial evidence, it was necessary, in order for them to recover on the allegations of their petition, that they exclude every other reasonably probable cause of the explosion and fire. The witness gave it as his opinion that it was not probable that the bottle gas was the cause of the explosion and fire and gave his reasons therefor. The cause urged by defendants was based wholly on speculation and conjecture, without any factual basis. There was no evidence that there was on that morning, or that there had been at any time in the past, any leakage of bottle gas from the hot-water heater, or the pipe line carrying the gas from the bottles outside of the building to the heater, or from the bottles on the outside of the building. The gas in the bottles did not explode until the fire was well advanced and after the firemen arrived and a considerable time after the initial explosion, which was felt and heard by Mrs. Ruth and O'Neill.

We find no merit in the claimed error with respect to the expert opinion testimony. It is true that since the use of gasoline has become so general in many ways, persons generally have become familiar with many of its qualities. So much so that it is our conclusion that the jury without the testimony of Doctor Arnold and under the other evidence would have reached the same conclusion as he did, and would have been justified in doing

so. But that does not mean that the court erred in admitting his testimony. Because of his years of specialization, research, and practical experience in the subject matter, his testimony informed the jury of attributes of gasoline beyond their knowledge and experience, and that of anyone who had not qualified himself by efficient study and training along that line. One qualified to instruct in a school for experienced firemen, and a professor in the chemical engineering department of Iowa State College, and who was a frequent consultant to the State Fire Marshal and to others in problems akin to the one involved in this case, was certainly qualified to, and did, give aid to the jury. His testimony was particularly pertinent, and applicable, to the facts in this case.

■ We have said that: "An expert's opinion is received because and whenever his knowledge of the subject matter is greater than the jury's, and aids them or is proper or essential to their information * * *." Grismore v. Consolidated Products Co., 232 Iowa 328, 344, 5 N.W.2d 646, 655. See also Craft v. Myers, 233 Iowa 521, 529, 10 N.W.2d 94; Ipsen v. Ruess, 239 Iowa 1376, 1391, 35 N.W.2d 82; Moyers v. Sears-Roebuck & Co., 242 Iowa 1038, 1046, 48 N.W.2d 881. The expert opinion given did not invade the province of the jury. Grismore v. Consolidated Products Co., supra, 232 Iowa 328, 344–348, 5 N.W.2d 646; Webber v. Larimer Hardware Co., 234 Iowa 1381, 1386, 15 N.W. 2d 286; Shatto v. Grabin, 233 Iowa 46, 53, 6 N.W.2d 149; Miller v. Miller, 237 Iowa 978, 988, 23 N.W.2d 760. The receipt of opinion evidence, whether by lay or expert witnesses, rests largely in the administrative discretion of the trial court. Grismore v. Consolidated Products Co., supra, 232 Iowa 328, 342; Waterloo Savings Bank v. Waterloo, Cedar Falls & Northern Railroad, 244 Iowa 1364, 1374, 60 N.W.2d 572, 578; Prokop v. Houser, 245 Iowa 480, 483, 62 N.W.2d 781, 783; Knaus Truck Lines, Inc. v. Commercial Freight Lines, 238 Iowa 1356, 1367, 29 N.W.2d 204.

There was evidence tending to support every factual premise in the hypothetical question, that is, there was evidential basis or inferences for the following matters, to wit: that gasoline overflowed from the intake pipe downward and into the window well, and through the cracks around the window down the basement

wall to the floor; that the atmospheric temperature outside the building was at the freezing point or 82 degrees higher than the flash point of gasoline, and that it was no doubt warmer in the basement, so as to cause gas vapor to generate and flow into the basement and sink to the level of the pilot light; that the pilot light burned continuously; that the compressor motor may have emitted electric sparks; that the gasoline gas or vapor mingled with the air in the basement to such an extent as to explode if ignited; that an explosion did occur; and the reasonable and probable ignition of the flammable mixture which caused the explosion and the resulting fire was the pilot light. Every pertinent factor with evidential support and every reasonable inference was made a premise in the hypothetical question. The question and answer did not invade the province of the jury.

II. Defendants complain because the court denied their motions for a directed verdict, and for judgment notwithstanding the verdict, on the ground that the evidence did not sustain the verdict. The motions were rightly overruled. The evidence clearly was sufficient to warrant the jury's finding that plaintiffs were free from contributory negligence in any degree. The evidence was also sufficient to sustain the finding of the jury that both defendants were guilty of negligence which was the proximate cause of the explosion, fire and loss to plaintiffs. The instrumentalities in the delivery of gasoline were in the control of the defendants. O'Neill connected the hose to the ethyl gasoline compartment of the tank, inserted the nozzle of the hose in the intake pipe of the underground tank, opened the proper faucets, started the motor to pump the gasoline through the hose, and then left and remained away for an unreasonable length of time without giving the slightest attention to the flow of gasoline into plaintiffs' tank. The jury could find his conduct was negligent and was the moving and proximate cause of plaintiffs' loss. What O'Neill did and did not do speak convincingly of his negligence. There was direct evidence that the gasoline overflowed in such volume as to completely surround the intake pipe in a wide circle of gasoline which reddened the snow and streamed down to and against the building and into the basement. There was some direct evidence of what then took place, of the explosion which shook the building and its contents, and

the resulting fire. What caused the explosion must be inferred from the circumstances. The rule as to the amount of circumstantial evidence necessary to establish a fact, as recognized by this court, has always been the same though not always expressed in identical language. In Woodard v. Chicago, R. I. & P. R. Co., 193 Iowa 516, 526, 185 N.W. 978, 982, we said it was sufficient if "the proven facts and circumstances are such as to justify a reasonable inference that the negligence of the appellant was the proximate cause of the injury. This is all that the law requires." In McGee v. Jones County, 161 Iowa 296, 300, 142 N. W. 957, 959, 48 L. R. A., N. S., 141, the rule is stated thus: "If the circumstances proven were such as to render this reasonably probable and more probable than that it happened owing to some other cause, the jury was justified in so finding." In Tisher v. Union Pacific R. Co., 173 Iowa 567, 570, 155 N.W. 975, 976, we used the language which has been followed in our later decisions, namely, the circumstances "must be such as to make that theory reasonably probable, not merely possible, and more probable than any other hypothesis based on such evidence." See Whetstine v. Moravec, 228 Iowa 352, 362–365, 291 N.W. 425, and cases cited; Latham v. Des Moines Electric Light Co., 229 Iowa 1199, 1207, 296 N.W. 372; Haverly v. Union Construction Co., 236 Iowa 278, 282, 18 N.W.2d 629; Brown v. Metropolitan Life Ins. Co., 233 Iowa 5, 13, 7 N.W.2d 21; Cable v. Fullerton Lumber Co., 242 Iowa 1076, 1082, 49 N.W.2d 530; Hayes v. Stunkard, 233 Iowa 582, 587, 10 N.W.2d 19. There is no sound basis for this assigned error. Reasoning and legitimate inferences from the established or known facts justify the finding of the jury as to the proximate cause of plaintiffs' loss. State v. Snyder, 244 Iowa 1244, 1252, 59 N.W.2d 223. It appears to us that the circumstances established by the evidence and the inferences therefrom are of such nature and so related to each other that the conclusion reached by the jury as to the proximate cause is the only one that can be fairly and reasonably drawn therefrom.

III. Plaintiffs began housekeeping in the service station upon returning from their honeymoon trip. From wedding showers for the bride and wedding presents plaintiffs were most

bountifully supplied with clothing, jewelry, woolen blankets, bedspreads, bed linen, table linen, dishes, silverware, kitchenware, and other household equipment and furniture. They were so oversupplied with many of these articles that much of it had not been used by them, but was stored in the building. Many other articles had been purchased by them. They had made lists of these gifts preparatory to sending out their messages of thanks and acknowledgment. These lists were at the home of the bride's mother. Their acquisition of this property was so recent that even though much of it was wholly destroyed they had clear recollection of it. Mr. Ruth made the list of his clothing, tools, station supplies, tires, tubes, automobile accessories, cigarettes, lunch counter, refreshment supplies, meats, grocery and food supplies. He made two lists in his own handwriting. They were Exhibits 10 and 11. After each item on the lists the price or estimated reasonable value of the item was placed. Mrs. Ruth made a similar list of her wearing apparel, personal adornments, and of the household goods, and equipment of every kind. This was Exhibit 12. They knew the cost of everything they had bought, although all of their books of account, invoices, receipts and canceled checks were destroyed in the fire. They had no knowledge of the selling price of their gifts and did not inquire of the givers, although they had fairly accurate judgment of the cost or value of many of them. But they made inquiries at various stores and business houses and individuals. They informed themselves as to the selling prices of other articles by an examination of a Sears & Roebuck catalogue.

Duplicates of these three lists were attached as exhibits to their petition filed in this case, so that defendants had definite knowledge of plaintiffs' claimed losses, over three months before the trial. There were several hundred separate items on these lists. For the most part they were articles of a type that every juror and particularly the occupants and owners of furnished homes would have general and sound knowledge of their fair values.

On direct examination they testified that they owned all of the property on the lists; that all of it was destroyed or rendered of no use or value by the fire; that they had knowledge

of the fair and reasonable value of each and all items on the lists of property, and such valuation was stated in dollars and cents after each item on the lists. Plaintiffs testified to some of these values in their direct examinations and testified to many more values on cross-examination. Mr. Ruth testified that the price and figure marked opposite each and every item of property on the lists, Exhibits 10 and 11, were in his opinion the fair and reasonable value of each of those articles, in that community at and prior to the fire on March 6, 1952. Mrs. Ruth gave like testimony as to each item of property on Exhibit 12. Each was qualified to testify not only because of their ownership of the property, but because of their knowledge of its worth and values. This court has many times held that ownership of property, in itself, qualifies the owner to give an opinion as to its value. Newland v. Iowa Railway & Light Co., 179 Iowa 228, 232, 233, 159 N.W. 244; Kirkwood v. Perry Town Lot & Improvement Co., 178 Iowa 248, 260, 159 N.W. 774; Tubbs v. Mechanics Ins. Co., 131 Iowa 217, 219, 108 N.W. 324; Thomason v. Capital Ins. Co., 92 Iowa 72, 79, 61 N.W. 843; Jeffries v. Snyder, 110 Iowa 359, 362, 363, 81 N.W. 678; City National Bank v. Jordan, 139 Iowa 499, 504, 505, 117 N.W. 758; Pederson v. Stevens, 241 Iowa 892, 894, 895, 43 N.W.2d 743; State of Iowa v. Hathaway, 100 Iowa 225, 226, 69 N.W. 449; Walters v. Iowa Electric Co., 203 Iowa 467, 470, 471, 212 N.W. 886.

The only objection to the value testimony of plaintiffs was made to an answer of Mr. Ruth. He had been asked if in arriving at the price of each article whether he had not attempted to assign the fair and reasonable value of it. There was no objection to the question. The witness answered that they had a Sears & Roebuck catalogue and they looked up the prices of the property on their lists and put it down. Defendants objected to the answer as wholly incompetent, irrelevant and immaterial, not the best evidence and hearsay, and moved that the answer be stricken for the same reason. The objection and motion were overruled. Defendants assign no error on this ruling unless it could be said to be included in the assignment of error in the reception of Exhibits 10, 11 and 12 in evidence. That was the only objection made to the value testimony of

plaintiffs. Later plaintiffs testified that they had used the catalogue only as an aid to their judgment in arriving at a fair valuation of some articles of property. The price of an article from any legitimate source is a proper factor in estimating its value. We note in State v. Strum, 184 Iowa 1165, 1167–1170, 169 N.W. 373, 374, that the value testimony of a witness, who showed himself to be qualified, was not rejected because the witness said, "He has a catalogue from the Chicago Wrecking House people, who quote 'all second-hand goods'."

The competency of neither plaintiff to testify to the value of any item of property was challenged in the trial, and in this court they concede their competency. Their only objection in the trial was to the admission of plaintiffs' lists of property, Exhibits 10, 11 and 12. And the only error assigned in this court is their admission in evidence.

When these exhibits were offered, defendants objected "for the reason they are wholly incompetent and immaterial, no proper foundation having been laid, and same are wholly incompetent to prove any issue in this case." The objection was overruled. The assignment of error is in the same language. There are two brief points.

IV. The first one is: "A mere ex parte memorandum of a transaction or occurrence is not admissible as evidence thereof against a third person. 20 Am. Jur. 795 (Sec. 942)." The point is not argued and we would be warranted in not considering it, but we prefer to discuss it somewhat.

Brief point two is: "Though a witness may be competent to testify as to the value of the property, the weight of such testimony is for the jury [Rottlesberger v. Hanley, 155 Iowa 638, 136 N.W. 776] and sufficient identification of the property involved should be given to enable the jury to weigh such evidence." The holding in the cited case is merely that the weight of the testimony is for the jury. We think it may save some repetition of the facts if both points are discussed together.

As we have stated these exhibits list and designate by name about 450 kinds of property, in that many items, some of which contain several of the designated article. Plaintiffs testified that they could not from memory recall each item and its value, but by use of the lists to refresh their memory they could do so.

■ With respect to the appellants' assertion of the insufficient identification of the articles of property listed on Exhibits 10, 11 and 12, it is sufficient to say that when they are designated, for illustration, as a shovel, hammer, hatchet, steel tape, a carpenter's square or level, a case of Prestone, bucket of transmission grease, battery, battery tester, brace and bits, so many cartons of cigarettes, a quarter of frozen beef, a pop cooler, so many cases of pop, 25 gallons of ice cream, 4 counter stools, windshield wipers, so many tires and tubes, cash register, deep freeze, Philco refrigerator, heat stove and cookstove, Mr. Ruth's two suits of clothes, so many white shirts, T-shirts, sweat shirts, overalls, sox, gabardine topcoat, raincoat, pairs of boots, shoes, and overshoes, neckties, one hat, Mrs. Ruth's four hats, pajamas, jeans, Elgin watch, dresses, coats, slips, a rug and pad, Maytag washing machine, ironing board, drapes and curtains, sheets, bedspread, woolen blankets, tablecloths, radio, silver tea set, kitchenware, dishes, typewriter, luggage, davenport, table and chairs, lamps, and each article is followed by its price or valuation, there is not much more description that would aid either the appellants or a jury. Appellants have pointed out an insufficient description in no item of property listed on any exhibit. The items speak for themselves to any juror. Appellants cross-examined plaintiffs at length on many of the items and were at liberty to inquire fully as to all of them. We find no merit in the second brief point.

■ With respect to the first brief point, this court has held that inventories of goods taken by the owners or others having knowledge of the property, after a fire has destroyed them, setting out the items and the value of each item are admissible as part of the testimony. In Furlong & Meloy v. North British & Mercantile Ins. Co., 136 Iowa 468, 470–472, 113 N.W. 1084, 1085, 1086, such a list was made by Meloy, a member of the plaintiff firm. We said: "This inventory constituted therefore Meloy's estimate of the amount and value of plaintiffs' stock just before the fire, and constituted affirmative evidence of one more familiar with the extent and value of the stock than anyone else could be, by personal knowledge, tending to show its value to have been somewhat in excess of $17,000. * * * The inventory * * *

represented the evidence of competent witnesses with reference to the quantities of goods found and the cost thereof."

In Casey v. Ballou Banking Co., 98 Iowa 107, 113–115, 67 N.W. 98, 100, an action for goods converted, a schedule of the goods with the values stated, prepared by a competent person was received in evidence. The court said: "The plaintiff was allowed to read in evidence, over defendants' objections, a paper attached to the petition as an exhibit. This paper contains a list of the goods and book accounts which it is claimed defendants converted, and it gave not only the items of merchandise, but the value of the same, and also stated the amount of the different accounts. The defendants objected to the exhibit as immaterial, irrelevant, incompetent, and not the best evidence. This objection was overruled * * *. [page 114] It seems to us that the exhibit was properly in evidence for the purpose for which it was offered. And it is probably true, that it was admissible as a schedule of the goods and accounts, with the prices and amounts affixed, to aid the jury in their consideration of the case."

In Thomason v. Capital Ins. Co., supra, 92 Iowa 72, 79, 61 N.W. 843, 845, action was brought to recover for insured property. The court said: "To prove the value of the articles burned, the plaintiff and her husband were used as witnesses, and no others. *A list of the articles had been prepared and was in court.* After stating that the furniture was burned, the husband was asked: 'What was the furniture worth?' There was an objection that he had not shown himself qualified, which was overruled, and he answered: 'It was worth three hundred dollars.' Similar questions were asked the plaintiff, and she fixed the value of the same, *being the value shown by the list.*" (Italics ours.)

In Edwards v. Cedar Rapids, 138 Iowa 421, 423, 116 N.W. 323, 324, an action for damages from a fall on a sidewalk, defendant offered the testimony of a witness to show that a large arc light was burning at the place at the time in question. The testimony was refused. The record does not show that the witness had any duty to keep a record of when the light went on and off. But he kept such a record. The court said: "The witness was the engineer at the electric light station, and he testified from a record kept by him which was made at the time, showing

when the light went on and off. The memorandum was itself offered in evidence, and should have been received. State v. Brady, 100 Iowa 191." Another memorandum by one who had an "official duty" to make it was also admitted.

In State v. Gates, 197 Iowa 777, 780, 781, 197 N.W. 908, 909, an inventory of the property in a dwelling house feloniously burned, made by a competent witness disclosing "an aggregate value of all property owned by the defendant" to be much less than the amount of insurance carried, was held admissible.

See also Lundvick v. National Union Fire Ins. Co., 128 Iowa 347, 348, 103 N.W. 970; State v. Brady, 100 Iowa 191, 198–200, 69 N.W. 290, 36 L. R. A. 693, 62 Am. St. Rep. 560; New England Syndicate v. Cutler, 162 Iowa 246, 248, 249, 143 N.W. 1095, 1096. In the last cited case an engineer supervising the remodeling of an apartment had made a memorandum of the salvage, which he had lost, but the manager of plaintiff had previously made a copy of it. This court said (page 249):

"This memorandum was used by the manager, who testified as a witness, to refresh his memory, and admitted in evidence for that purpose. Appellant [defendant] contends this was error. We think not. * * * Another small memorandum book, Exhibit A, was admitted over defendant's objection. This was admitted in connection with the testimony of the party who made it, and who had knowledge of the facts. * * * As to this, the same rule applies as to Exhibit B, except that Exhibit A had not been lost. Neither of these exhibits was offered or admitted as account books."

In Graham v. Dillon, 144 Iowa 82, 83–85, 121 N.W. 47, 48, defendant on trial produced an alleged book of accounts which was challenged. He used it to refresh his memory, and the book was then received in evidence, over appellant's objection. Without passing upon the complaint, this court said: "But, whatever the rule should be in such cases, we need not now determine the question, because, the defendant having used the book to refresh his recollection, there was no error in permitting it to go to the jury [citing authorities]. * * * The value of the memorandum or entry as evidence is for the jury to determine as it must

determine the weight to be given the testimony relating to the entry."

The trial court did not err to the prejudice of defendants nor abuse its discretion in the admission of these exhibits.

V. Defendants excepted to several of the court's instructions. Some of the exceptions are brief and lack somewhat in definiteness. They requested no instructions. The instructions sufficiently covered the law of the case and fully protected defendants' rights. We find no prejudicial error in them.

The judgment is—Affirmed.

All JUSTICES concur.